**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
------------------------------------------------------------ X

MICHELLE LUGONES, TRICIA RIZZI,      :
MARCUS SIEZING, and CLAUDIA      :    Civil Case No.:
VASSALLO, on behalf of themselves and a      :
class of similarly situated individuals,      :
     :
     :    **CLASS ACTION**
           Plaintiffs,      :    **COMPLAINT**
     :
     v.      :
     :    **Jury Trial Demanded**
PETE AND GERRY'S ORGANICS, LLC and      :
NELLIE'S FREE RANGE EGGS,      :
     :
           Defendants.      :
------------------------------------------------------------ X

Plaintiffs Michelle Lugones, Tricia Rizzi, Marcus Siezing, and Claudia

Vassallo, individually, and on behalf of a proposed Class (the "Class" or "Plaintiffs"),

by and through their undersigned counsel, as and for their Complaint against

Defendants Pete and Gerry's Organics, LLC, and Nellie's Free Range Eggs

("Nellie's" or "Defendants"), hereby allege as follows:

## SUMMARY OF CLAIMS

1.     The sale of eggs is big business. In 2014, total egg production value in

the U.S. was more than **10 billion dollars**. In the last 20 years, *per capita*

consumption has increased annually as more Americans turn to eggs for an

affordable source of protein. The egg industry has reaped billions in profits.

2.     Some of the biggest benefactors from this boom are egg sellers that

deliver eggs to consumers who seek assurances of consideration for the welfare of

laying hens. Millions of consumers spend more money to buy eggs produced by laying hens that they believe to be treated more humanely.

**Nellie's Eggs: Profits over Truth**

3.     A lie has two parts: (i) the intent to lie and (ii) the failure to notify the one being lied to of the deception. Nellie's knowingly lied to Plaintiffs and potential Class members and perpetuated their deception through the sale of falsely advertised eggs to millions of consumers in order to pad their bottom line.

4.     Nellie's is one of the largest sellers of eggs from free-range laying hens. With a freshly minted agreement to supply all eggs to the Boston Red Sox for the upcoming baseball season, and reported revenue of $177 million in 2017, Nellie's is poised for record returns in 2019.

5.     Nellie's profits come at the expense of consumer trust and cruel treatment of laying hens. Plaintiffs commence this action to hold Nellie's accountable for its betrayal of both consumers and hens.

6.     As detailed below, Plaintiffs believed they were buying and eating eggs from laying hens that enjoyed lives free from unnecessary pain and distress, had access to green fields, space to spread their wings and engage in natural behaviors, and the opportunity to thrive in functional social groupings. They believed this because it is what Nellie's told them. Nellie's packaging promises its hens "love," "better lives," "green grass," and shows hens frolicking outside under blue skies.



7.     Nothing could be further from the truth. The harsh reality is that Nellie's crams and stuffs hens—sensitive, intelligent animals, who feel pain acutely and who in natural environments will form complex social bonds—into sheds up to 20,000 at a time. This overcrowding prevents them from extending their wings, foraging, or making their way to the outdoor space Nellie's advertises so prominently. Such confinement leads to stress and trauma that in turn causes them further pain in the form of fighting, feather pecking, and self-mutilation.

8.     To eke out profits from hens kept in these conditions, Nellie's systematically mutilates laying hens' beaks. This mutilation causes lifetime pain and suffering, inhibiting natural behaviors. These mutilated, crowded hens then lay an egg once a day, every day, for thirteen months. After only thirteen months, these

hens are broken down and depleted of the calcium needed to lay eggs strong enough to make it to market. Once their value to Nellie's declines, Nellie's sells them to slaughterhouses and live markets that kill them, scared and in pain, alongside hens raised by sellers whose practices Nellie's tells consumers they are avoiding.

9.     Consumers pay more for Nellie's eggs than eggs advertised more conventionally. This is because of Nellie's lies. These lies violate consumer protection laws and subject Nellie's to monetary penalties and equitable and injunctive orders. Nellie's must cease falsely advertising the degree of love, green grass, and humane treatment it provides laying hens or else treat hens as advertised.

10.     Nellie's fictions of green grass, blue skies, and love and kindness are exposed. Plaintiffs refuse to allow this con to continue.

## JURISDICTION AND VENUE

11.     The jurisdiction of this action arises under diversity of citizenship, which is codified pursuant to 28 U.S.C. § 1332, given that Plaintiffs are citizens and residents of New York and Defendants are residents of and incorporated in New Hampshire, and this action involves an amount in controversy in excess of $75,000, exclusive of interest and costs.

12.     The Court has personal jurisdiction over Defendants because they conduct business in New York and a substantial portion of the events and omissions giving rise to this action took place in New York, New York. By way of only one example supporting the Court's personal jurisdiction over Defendants, they market

and sell thousands, if not millions, of eggs throughout New York and Manhattan on a daily basis. Plaintiffs purchased eggs from Nellie's in stores located in Manhattan as well as other parts of New York. The deceptive practices, misrepresentations and omissions alleged herein were contained on Nellie's packaging and cartons of eggs sold on a daily basis uniformly to consumers throughout New York.

13.     Venue is proper in the Southern District of New York pursuant to 28 U.S.C. § 1391 because a substantial part of the events and omissions giving rise to this action occurred in this district, and because Defendants operate and conduct business in this district on a regular and daily basis.

## PARTIES

14.     Plaintiffs **Michelle Lugones** and **Marcus Siezing**, husband and wife, strive to make ethical purchasing decisions. To them, humane treatment of animals is a priority—Michelle is a veterinarian; Marcus grew up on a farm. Convinced by the images and words seen on cartons of Nellie's eggs, they both purchased Nellie's eggs from their local Whole Foods in Tribeca, New York. Together, they purchased them regularly between 2017 and 2018. Defendants made the decision easy: On each carton of Nellie's eggs, Michelle and Marcus saw images and descriptions of happy hens. Some of these hens were enjoying themselves in green fields. Some of these hens, according to Nellie's cartons, even had names. Encouraged by Defendants' product packaging, Michelle and Marcus believed themselves to be purchasing eggs sourced from small farms providing all hens with space to move around both indoors and outdoors. A check of Defendants' website reinforced these

images. Had they known the truth, Michelle and Marcus would not have paid premium prices for Nellie's eggs.

15.     Plaintiff **Tricia Rizzi** purposefully spends more on eggs in order to ensure she is supporting humane animal husbandry practices. Every animal, in Tricia's view, should be able to feel like an animal in his or her natural environment. After first seeing the advertising on cartons of Nellie's eggs more than five years ago, Tricia regularly purchased Nellie's eggs from a number of stores in her hometown of Massapequa, New York. She encouraged her friends to do the same. This was because, of the eggs offered for sale, Nellie's eggs were the only ones that gave Tricia the impression they came from loving family farms. Defendants reinforced this impression—going so far as to suggest, in some cartons she purchased, that its farms are small enough that its hens even have individual names. Had she known the truth, Tricia would not have paid premium prices for Nellie's eggs.

16.     Plaintiff **Claudia Vassallo** is one of the friends Tricia encouraged to purchase Nellie's eggs. Taking the images and descriptions on each carton of Nellie's eggs at face value, and convinced that Nellie's eggs offered a more chicken-friendly option, Claudia purchased Nellie's eggs for more than three years. If she had known the truth—that, for example, instead of having the ability to roam freely outdoors, Defendants source their eggs from farms that cram approximately 20,000 hens into an over-crowded shed—she would never have paid premium prices for Nellie's eggs.

17.     **Pete and Gerry's Organics, LLC** is a New Hampshire corporation headquartered in Monroe, New Hampshire. Pete and Gerry's is one of the nation's largest sellers of eggs, with $177 million in reported sales revenue in 2017. The "Gerry" in Pete and Gerry's is Gerry LaFlamme. The "Pete" is Pete Stanton. Mr. Stanton is a cousin of Gerry LaFlamme's wife. Jesse LaFlamme, the son of Gerry LaFlamme, is an owner and the CEO of Pete and Gerry's Organics, LLC.

18.     **Nellie's Free Range Eggs** is an entity controlled by Pete and Gerry's Organics, LLC and has the same corporate address. Pete and Gerry's Organics, LLC uses the Nellie's Free Range Eggs corporate identity to conduct various business, including a new partnership with the Boston Red Sox. Jesse LaFlamme also heads Nellie's Free Range Eggs.

19.     Defendants sell Nellie's eggs in more than 9,600 retailers across the country. As of 2017, Nellie's represented that it produces its eggs through a network of "family" farms located in 12 states, including New York, Pennsylvania, New Jersey, and Vermont.

## BACKGROUND AND FACTUAL ALLEGATIONS

### A. Chickens Are Sensitive, Inquisitive Animals Who Suffer if They Cannot Meet Their Physical, Behavioral, and Social Needs

20.     Chickens are highly sensitive and inquisitive animals.

21.     Young chicks are capable of discriminating quantities and grasping simple arithmetic concepts. For example, days-old chicks can identify the larger between sets of different numbers of objects. When tested, they retain this ability

even after testers hid the objects behind opaque screens. This suggests chicks are capable of simple addition and subtraction.

22.    Young chicks also exhibit varying degrees of object permanence—the ability to understand objects continue to exist even when they cannot perceive those objects. For example, days-old chicks retain the ability to tell the difference between shapes that are missing pieces and shapes that are merely partially hidden. Some chicks are even able to comprehend the continued existence of objects that have been completely hidden—an even more advanced form of object permanence.

23.    Adult chickens are capable of even more cognitively and emotionally complex achievements. For example, chickens can perceive and predict time intervals. When encouraged to peck at a computer screen in six-minute intervals in order to receive food, chickens show they can estimate the passage of time by increasing their pecking frequency around the six-minute mark.

24.    Chickens can also rationally discriminate between future outcomes and resist instant gratification to optimize future reward. When given a choice between a two-second delay followed by access to food for three seconds and a six-second delay followed by access for 22 seconds, chickens can hold out for the larger reward.

25.    Chickens likely retain short-term episodic memories. This is suggested both by the cognitive abilities described above and by more direct testing. For example, chickens can remember the trajectory of a hidden ball for up to 180 seconds.

26.     Chickens are capable of empathy—the ability to be affected by and share the emotional state of others. Hens watching their chicks exposed to even mildly negative stimuli (such as air puffs) vocalize in distress, spend less time grooming their feathers and more time standing alert, exhibit an increase in heart rate, and exhibit lower eye and comb temperatures (indicating constricted blood vessels and increased body core temperature). Hens exhibit similar responses even when they cannot hear the chicks' distressed vocalizations. This suggests the hens can logically apply their knowledge of the unpleasant nature of air puffs.

27.     Chickens pass cultural knowledge amongst themselves. Hens presented with a mixture of safe yellow and tainted blue corn kernels actively steer their chicks to yellow kernels. Hens who observe trained peers peck one of two keys for food learn to peck the same key.

28.     Chickens are acutely sensitive to temperature, pressure, and pain. Accordingly, chickens have evolved a number of instinctive behaviors that are essential to their well-being. They preen their feathers (run their feathers through their beaks) to improve the feathers' ability to provide insulation. They "dust bathe" (roll or move around in dirt) to clean their skin and feathers. They "roost" (perch on high surfaces) in order to feel safe. They spend significant amounts of time foraging, exploring, and pecking at food sources on natural ground. Because chickens cannot perspire, they cool themselves by dunking their beaks in cold water or extending and flapping their wings to ventilate their bodies and separate their feathers.

29.     Unsurprisingly, given their cognitive, emotional, and physical abilities and needs, chicken social interactions and hierarchies are complex. Hens and chicks begin calling to each other before the chicks have hatched. Mature chicken communication consists of at least twenty-four distinct vocalizations and a variety of displays. Chicken communication is "referential"—meaning that chickens modify their vocalizations and displays in order to convey information to others. For example, chickens will issue alarm calls of differing pitch and duration depending on both the type of predator and type of chickens present. A male chicken is more likely to issue an alarm call signaling aerial predators when hens are present. Chicken communication also demonstrates awareness of the perspectives of other animals—chickens will give longer alarm calls when under cover of a tree or bush, suggesting they understand the aerial predator cannot see them.

30.     Each chicken is an individual with a distinct personality. Like humans, chickens can be more or less outgoing, brave, shy, fearful, or aggressive. Chickens' personality quirks shape their interactions with other chickens. When placed together for the first time in reasonably sized social groupings, hens establish dominance hierarchies (called "pecking orders"). Chickens can recognize individuals, and distinguish which chickens are—or are not—part of their social group. When placed in new social groups, hens observe relationships between other hens and apply this information logically in order to inform their own interactions.

31.     Provided with enough space and areas in which to efficiently escape or hide, hens of a wide variety of personality types can harmoniously navigate the

social dynamics of a reasonably sized flock. The less space available, the more stressed hens become in establishing and maintaining social dynamics and securing access to resources such as food, water, roosts, and space. Hens suffer physically and mentally if they have no efficient way to escape hens that are more aggressive.

## B. Defendants Design Their Egg Cartons to Attract Consumers Who Care About Animal Welfare

32. A growing population of American consumers believes it is important that the food industry treat farmed animals—including chickens—humanely. Many of these consumers base their purchasing decisions on animal welfare. These consumers are willing to spend more if it means that food sellers source their products from animals treated humanely. The food industry is well aware of, and monitors and reports on, this trend.

33. Defendants, under the Nellie's corporate identity, design their egg cartons to appeal to these consumers. For example, cartons of Nellie's eggs are emblazoned with a variety of the following cheerful slogans and representations of animal care:

- "WE LOVE OUR HENS, YOU'LL LOVE OUR EGGS"

- "WE LOVE OUR HENS"

- "THEY ROAM WHERE THEY PLEASE"

- "BETTER LIVES FOR HENS MEAN BETTER EGGS FOR YOU!"

- "THE GRASS IS GREENER WHEN THERE IS ACTUALLY GRASS"

- "A KINDER KIND OF EGG"

- "BLUE SKY ABOVE, GREEN GRASS BELOW. JUST LIVIN' THE DREAM."

- "OUTDOOR FORAGE"

34.     The cartons also come with paragraph-length explanations of how Nellie's eggs are better—kinder—than the competition. For example, in explaining to consumers why "[m]ost hens don't have it as good as Nellie's," many cartons of Nellie's eggs state that, in contrast to deceptively-labeled "cage-free" eggs, Nellie's hens "can peck, perch, and play on plenty of green grass."

35.     To drive home this point, the email address on the carton, at which Defendants invite customers to contact them, is "kindnesscrew@nelliesfreerange.com."

36.     Consumers do not view—and interpret—these slogans in the abstract. Rather, consumers view them alongside images of hens frolicking in lush, open fields:













37.    The impression conveyed by these words and images is clear: Defendants let their hens engage in natural behaviors—stretch, roam, forage, and dust bathe—on grass, and live free from the over-crowding and stress found elsewhere.

38.    Defendants intend consumers to rely on these words and images as specific claims about how Defendants treat their hens. If consumers have any doubts, Defendants invite them to learn more on Nellie's website.

39.     Consumers taking Defendants up on their offer to investigate further on Nellie's website would encounter the message that Defendants' farms are exactly as they appear to be on each carton of Nellie's eggs.

40.     A consumer visiting Nellie's website in the past year would find links to videos with the following text and imagery:

- A young boy holding a hen outside, with the text "A KINDER KIND OF EGG™ WATCH OUR CAGE-FREE HENS RUN";

- A young girl holding a hen outside, with the text "WE LOVE OUR HENS, YOU'LL LOVE OUR EGGS™ CHECK OUT OUR NEW VIDEO";

- A "Cage Free" egg carton, with the text "UNDERSTANDING EGGS"; and

- A young boy, pictured in black-and-white, on a bicycle with a hen in its basket, with the text "THE NELLIE'S STORY."

41.     The title of the first of these videos is "Certified Humane, Free Range Hens outside on green grass." Jesse Laflamme, the "Chief Executive Farmer" for Defendants, narrates. With wide shots, this video depicts open sprawling farms of green grass with hens, outside, scratching and dust bathing. Laflamme discusses the hens' access to the outside where "they enjoy the sunshine and the green grass," Defendants' "belie[f] that hens should be outside, they should be free range," and that Defendants' hens "just love being outside in the grass, they love scratching, they love dust bathing, they love being able to roost and socialize out in the

- 15 -

sunshine. It's where hens should be." The video shows hens only in these expansive outdoor spaces:



42.     The title of the second video is "Hens are Friends." It depicts, in both contemporary and vintage footage, small groups of hens outdoors frolicking with or eating from the hands of children. The video also shows young children gathering eggs in what appears to be a small henhouse. To drive home its message—"WE LOVE OUR HENS"—a boy stands amid a green landscape and small buildings, surrounded by playful hens:



43.     The title of the third video is "Understanding Eggs." It discusses "what goes into making a good egg" and how to "know if an egg comes from a happy hen or even a healthy one." It discusses the difference between specialized egg labels: "all natural farm fresh," "cage free," and "free range." The narrator describes a "cage free" hen as "still liv[ing] inside a space much like a large overcrowded warehouse"—deeming it "still a pretty grim existence" because "she'll never get to see the outdoors or have the environment she needs to act like a normal hen." For comparison, the video includes an image of a cage free farm:





44.     Defendants then contrast this image with descriptions of their own hens, who are "happy" because they "get to live their lives like real hens. With access to pasture every day in good weather, our hens can spread their wings, forage in the fields, or scratch at the dirt." The video includes a series of images purportedly depicting its farms:











45.     The title of the fourth video is "Jesse & Nellie Deliver Eggs By Bicycle." Nellie's co-founder Carol Laflamme narrates. She describes, over imagery of sprawling fields, Jesse Laflamme having a pet chicken at home named Nellie who would play in a sandpit, sit on his lap, and sit in the basket of his bicycle while he rode around to sell eggs to neighboring families.

46.     Defendants repeat, and elaborate on, these messages elsewhere on Nellie's website. Under a heading, "LIFE ON A FREE RANGE FARM," Defendants tell consumers: "Our happy hens are free to roam and strut throughout their wide open pasture. They peck at bugs and flowers, cluck around in groups, and just live as free as a bird all day long."

47.     This section of Defendants' website is accompanied by multiple images showing hens in idyllic pastures, roaming at will:



48.    Under another heading, "OUR FREE RANGE HENS," Defendants tell consumers: "Nellie's Free Range Hens are among the happiest hens on earth. They love spending their days in sunshine and laying nutritious eggs that simply taste better than factory-farmed eggs."

49.    A video slideshow that accompanies this claim shows a little girl running and playing with hens free to roam easily outdoors:



50.   Under another heading, "UNDERSTANDING FREE RANGE VS. CAGE-FREE," Defendants tell consumers: "Nellie's hens have the freedom to move about their barns and their adjoining pasture at will. Our hens live in a healthy, happy environment—just as it's meant to be!"

51.   An image that accompanies this section of Defendants' website shows hens streaming out of their barn into the outdoors:



52.   Under another heading, "WE TREAT OUR HENS LIKE FRIENDS," Defendants tell consumers: "This means that our family farmers treat all of our free range hens like they would treat any friend, with love and gratitude."

53.   An image that accompanies this claim shows a little girl hugging a hen, in front of a flock of hens roaming outdoors:



54.     In a section of their website that asks: "What is Free Range?"

Defendants tell consumers their "free range environment . . . guarantees that on

every one of our small, free range farms:

- Hens live in 'floor barns' (i.e. no cages or levels) and have plenty
  of space to perch and socialize.
- They have easy access to the outdoors with real grass to peck,
  play and dust bathe.
- They have access to antibiotic free feed and fresh water 24/7.
- And much more."

55.     Above this page, a banner ad claims Defendants' hens have a "STRESS

FREE ENVIRONMENT":



56. Nellie's website champions Defendants' conduct as the gold standard of egg production, stating "if there *was* a better way to raise them — we'd be doing it."

57. In all, Defendants' website has a clear, uniform message for consumers. This message is that consumers should understand the slogans, images, and statements on each carton of Nellie's eggs both seriously and literally.

## C. Contrary to Their Claims, Defendants Give Their Chickens Only Short, Cruel Lives in Cramped, Highly Stressful Environments that Often Provide No Viable Outdoor Access

58. Defendants' work to convince consumers they provide chickens happy, healthy, and low-stress lives is deceptive. Instead of space to stretch, flap their wings, forage, dust bathe, and enjoy functional social interactions, Defendants provide hens cramped, stressful environments, lacking meaningful access to the outdoors or to sunlight. These hens have their beaks mutilated when they are one day old. Defendants deprive them necessary vitamins and nutrients. They lay an egg a day, every day, for most of their lives. After Defendants' overworked, crowded, and malnourished hens prematurely deplete themselves of calcium, Defendants sell them to slaughter.

59. The male chicks that escape this fate fare no better. They are violently killed shortly after birth.

**1) Defendants Condone Killing Male Newborn Chickens**

60.     The life cycle of the chickens kept by Defendants starts with death.

Defendants contract with hatcheries to breed chickens. Once the chicks hatch, they

are sorted by sex. The female chicks are marked for life as laying hens and are

transported to pullet houses when they are one day old. They are warehoused at

pullet houses until they can lay eggs. The male chicks are systematically and

gruesomely killed.

61.     By Defendants' admission, these hatcheries may use any one of the

many methods condoned by the American Veterinary Medical Association (AVMA)

to kill these male chicks.

62.     These methods include the most common method used to kill male

chicks: Maceration. Maceration entails running the male chicks, fully conscious,

through a machine with rotating blades similar to a wood-chipper. The AVMA

condones maceration as one acceptable killing method both because it is "almost"

instantaneous and because "[l]arge numbers of animals can be killed quickly." The

AVMA cautions that if chicks are not delivered to the macerator correctly, there can

be a "backlog of chicks at the point of entry into the macerator." This can cause

"injury, suffocation, or avoidable distress to the chicks before maceration."

63.     Another AVMA-condoned killing method is exposing chicks to carbon

dioxide ($CO_2$). It can take minutes of exposure to kill day-old chicks exposed in

batches. Because immature chicks' respiratory systems are not fully developed, the

AVMA warns that "high $CO_2$ concentrations, combined with extended exposure

times" may need to be accompanied by a secondary killing method. Death via $CO_2$ exposure may lead to prolonged suffering.

64.     Death via exposure to $CO_2$ is painful. Before death, exposure to $CO_2$ can cause carbonic acid to form in the nose and eyes. Carbonic acid is an irritant that is acutely painful and causes air hunger, a distressing condition in which an individual feels they are not getting enough air. The AVMA acknowledges that, because of the convulsions induced by $CO_2$ exposure, this killing method can "be disconcerting for observers."

65.     Exposure to carbon monoxide, nitrogen, or argon—other condoned methods—can also induce distress and convulsions before death. In chickens, these gases cause convulsive wing flapping. Use of either nitrogen or argon to kill chickens requires exposure for more than three minutes.

**2) Defendants Require All Hens They Keep Have Their Beaks Mutilated**

66.     The surviving chicks all have their beaks "trimmed" at one-day old. (The same day they are transported to pullet houses.) Beak "trimming" is a euphemism for cutting or searing off approximately one-quarter of a chicken's upper—or both upper and lower—beak.

67.     Chicken beaks are particularly complex and sensitive sensory organs. The tips of chicken beaks contain clusters of highly sensitive mechanoreceptors. These mechanoreceptors are capable of feeling acute pain. Left fully intact, chickens use their beaks to engage in precise tactile behaviors. In nature, chickens will spend

more than 60 percent of their time engaging in instinctive foraging behaviors—pecking and scratching at potential food sources.

68.    Hot blades often used to sever beaks can damage nerves two to three millimeters away from the cut site due to the high temperature of the blade. Abnormal nerve growths frequently develop near the end of the nerve stump. These abnormal growths exhibit similar spontaneous discharge patterns seen in human amputees experiencing phantom limb pain, and it is likely that chickens experience chronic pain as a result of beak amputations.

69.    Defendants state they have recently begun "transitioning" to an infrared beak cutting method. This method of beak cutting still generally requires hens be restrained by the head and suspended.

70.    Beak cutting—by either method—reduces sensory function due to removal of mechanoreceptors. The mutilated beak mostly lacks physical sensation. This deprives mutilated hens of the ability to experience a full range of instinctive foraging behaviors. Hens that have had their beaks cut spend more time engaged in passive behaviors, such as resting and standing, instead of more natural, active behaviors. Beak-cut hens also engage in more guarding behaviors associated with pain.

71.    Beak-cut hens suffer from a variety of other maladies. Their ability to consume food is impaired. This is both because beak-cut chickens have greater mechanical difficulty in feeding and because they likely feel increased pain and discomfort caused by tissue, nerve, and sensory receptor damage. In addition,

studies have shown beak-cut chickens are further discomforted by being unable to effectively rid themselves of lice—likely because they are slower to respond and less effective at preening their feathers.

72.     Beak cutting is not a necessary evil. More humane flock management practices allow hens to be kept with intact beaks. While the ostensible purpose of beak cutting is to prevent severe feather pecking, self-mutilation, and cannibalism among farmed hens, beak cutting is only a requirement in farms that house hens in dysfunctional social groupings and environments lacking crucial resources. Farms that do not subject hens to extreme density and stress; manage pollutants; include more sheltering areas, warmer lighting, and environmental enhancements such as pecking blocks and appropriate perches; and that adequately stimulate feeding and foraging behavior—including via adequate nutrition and suitable litter—do not need to cut hens' beaks.

### 3)  Hens Kept by Defendants Are Crammed Tightly Together in Sheds

73.     Once they can lay eggs, these hens are sent to the contract farms Defendants brag about on each carton of Nellie's eggs.

74.     At these farms, approximately 20,000 hens are crammed together in a single shed. They are limited to only 1.2 square feet of floor space each, if that. Visitors to these sheds have difficulty walking without stepping on hens. This arrangement is far from the images Defendants sell the public on their egg cartons:











75.    Confinement to such restricted space actively harms hens. It prevents hens from performing many natural behaviors, such as extending their wings, stretching their necks to forage, moving about, dust bathing, or properly roosting and resting. The ability to move through a variety of natural postures is important for overall bone and muscle strength, and reduces the risk of other issues such as painful foot lesions and deformations. Inability to perform these activities causes distress, trauma, and illness.

76.    Forcing so many hens together also causes psychological harm, which in turn leads to additional physical harm. Hens cannot maintain a natural pecking order at this population density. Instead, many stressed hens will violently enforce ad-hoc social dynamics to secure access to the limited space and resources available. Other hens will suffer from bullying and from being pecked. Defendants exacerbate these conditions by not offering sufficient hiding places that would permit hens to efficiently escape aggression.

77.    Many of the hens kept by Defendants suffer feather loss. Missing feathers are often caused by injuries inflicted either by hens who are more dominant or by self-mutilation, in which hens will pluck their own feathers due to stress or inadequate diet.

78.    Hens whose movements are so severely restricted in this manner are likely to develop osteoporosis, bone fractures, painful foot lesions, and other deformities. Relative inactivity and inadequate nutrition cause and exacerbate these conditions.

79.     Confining so many hens together frequently causes the hens to engage in excessive vocalization. As a result, the noise level is often cacophonous. This is another harm to the hens. Chickens are highly sensitive to sound. Unlike humans, they can detect both low-and-high frequency sounds at a wide range of pressure levels. Excessively noisy environments cause chronic stress to hens, which can lead to overproduction of adrenal hormones and suppression of the immune system.

**4)  Many Hens Defendants Keep Never See the Outdoors**

80.     Many of the hens kept by Defendants never access the outdoor space featured so prominently on cartons of Nellie's eggs. At some of Defendants' farms, hens can only get outside through small hatches cut at intervals along the sides of the shed:









81.     These hatches are closed all winter and during inclement weather. Even in pleasant weather, these hatches are closed at night and not opened until 1:00 p.m. the next day.

82.     These hatches are window-dressing. Because Defendants cram so many hens inside one shed and prevent the hens from engaging in functional social dynamics, hens that are far away from these hatches cannot access them without pushing past many thousands of other frantic hens, who may be more socially dominant.

83.     Many of these hens will never access the hatches and so will never see or feel grass, soil, fresh air, or sunlight. For these hens, the distance and crowd of

hens it would be necessary to push through to get to the hatches acts as a permanent deterrent.

84.     The overcrowding Defendants force on these hens exacerbates the problem. Because the hens learn to aggressively protect their tiny spaces, any hen attempting to reach these hatches risks attacks from other hens.

**5) Defendants Kill Hens After Their Value Quickly Diminishes**

85.     Hens kept by Defendants lay an egg a day, every day, starting when they are 17 to 18 weeks old. This lasts only 13 months. After 13 months, this high rate of egg laying has depleted the hens of calcium and worn out their reproductive systems. When hens lack sufficient calcium to continue egg laying, they will drain calcium from their own bones. This condition—known as hypocalcemia—causes osteoporosis, bone fractures, weakness, paralysis, and sudden death.

86.     Another symptom of hypocalcemia is that hens lay fewer eggs. The eggs they do lay become more thin, fragile, and prone to breaking.

87.     Calcium depletion—hypocalcemia—after 13 months is not a natural part of a hen's life cycle. It is a condition caused by overproduction, dietary vitamin and mineral imbalances, and lack of access to direct sunlight needed to activate vitamin D and to aid in calcium absorption. Stress exacerbates hypocalcemia.

88.     Hypocalcemia marks the beginning of the end for these hens. Broken eggs, in the words of a Nellie's supplier, "leech into the profits." Consumers may have assumed, based on Defendants' advertising, that "love" would mean feeding

and housing retired hens, or adopting the hens out to sanctuaries. Defendants reject these options.

89.    Defendants reject these options because "it would prevent us from achieving our broader aim of building a sustainable business" (what Defendants state on their website) and because "feed is very expensive" (what one of Defendants' suppliers told a visitor to one of their farms). Instead, Defendants sell their hens to slaughterhouses and live markets.

90.    Defendants admit that, once they sell their hens to a slaughterhouse or a live market, "the hens belong to that company."

91.    At live markets, hens often live in the conditions Defendants tell consumers they deplore. It is standard practice for live markets to pack hens into crates and cages for extended periods, deprive hens of food or water, and leave hens immersed in filth. After a live market customer picks a hen, live market staff will likely weigh her upside down, with her head hanging down, in a position that is distressing and fear-inducing because it prevents her from breathing properly.

92.    Killing methods used by slaughterhouses and live markets, some of which are described above, include gassing (using agents such as $CO_2$, carbon monoxide, nitrogen, and argon), cervical dislocation (manually severing the spinal cord), electrocution, decapitation (chopping off a hen's head), and exsanguination (throat slashing to drain a hen's blood).

93.    Decapitation requires handling and restraint that causes hens extreme distress. It also requires qualified personnel and expert maintenance of equipment

in order to avoid excessive pain. Qualified personnel and perfect maintenance of equipment are not always present.

94.      Electrical activity in a hen's brain continues after her head is chopped off, indicating that death is likely not instantaneous.

95.      Exsanguination, performed "properly," requires a hen first be completely stunned or unconscious before her throat is slashed. Methods of stunning hens or rendering hens unconscious are imperfect, and often lead to hens having their throats slashed while still alive. This causes extreme anxiety, pain, and distress. Methods of stunning hens or rendering hens unconscious also cause distress or pain themselves. For example, electrical water bath stunning requires forcing a live, conscious hen upside down by her legs into metal shackles. Poor shackle design can cause significant pain—chickens have pain receptors in their legs—and lead to painful pre-stun electric shocks.

96.      Another common method of exsanguination involves use of killing cones. Killing cones are typically trapezoid-shaped metal funnels into which a hen is shoved face down before having her throat slashed. An inexpert or flawed slash will prolong the time until death and cause her more pain and distress. She will kick and jerk while her blood is draining. If not properly secured, spasms can flip her out of the cone onto the floor to thrash about before she fully bleeds out.

97.      Electrocution commonly involves two steps. The first step requires an electrical current to be passed through a hen's head to induce unconsciousness. A second current is then used to induce cardiac arrest. If electrodes are placed

incorrectly—or if the first step is neglected—she may be fully conscious during electrocution.

98.     Cervical dislocation requires grasping a hen's legs or wings and stretching her head by pulling on her head while rotating her skull, snapping her spinal cord. Cervical dislocation does not always cause immediate unconsciousness, and when performed improperly will cause pain, paralysis, and prolonged time to death. Proper execution of cervical dislocation requires mastery of highly technical skills.

99.     The AVMA does not approve use of any of these killing methods for companion animals—i.e., animals for whom the relationships between owners and animals merit consideration.

100.    It is possible that the live markets at which Defendants' hens end up kill these hens via even more prolonged, distressing, and painful methods than those described above. Manual blunt force trauma, gunshots, captive bolts, drowning, and smothering are other methods used to kill chickens.

101.    Some live markets also sell hens, still alive and conscious, to individuals who will kill them using whatever method that individual may choose.

102.    The above scenarios represent situations in which everything goes "right" for hens sold by Defendants. Hens sold to slaughterhouses and live markets, as these hens are, have also been known to:

- Suffocate beneath other chickens in over-crowded conditions;

- Drown or be scalded alive after being forced into scalding tanks while still conscious;

- Suffer and die from dehydration or exposure to heat or freezing temperatures while being transported; or

- Suffer and die from sadistic abuse by slaughterhouse or live market staff.

103.    After Defendants sell a flock of 20,000 hens, farm staff sweep, power wash, and sanitize the shed. At a pullet house, tens of thousands of newborn hens have had their beaks newly cut. Their brothers are fed to a macerator. Defendants are ready for the next 20,000 hens to move in.

**CLASS ACTION ALLEGATIONS**

104.    Plaintiffs seek redress in their individual capacities and on behalf of a Class consisting of similarly situated consumers. Pursuant to Fed. R. Civ. P. 23(a) and (b)(2) or (b)(3), Plaintiffs seek Class certification of a Class defined as follows:

105.    All individuals in the U.S. who purchased Nellie's eggs in the last three years.[1]

106.    Plaintiffs reserve the right to amend or modify the Class definition with greater specificity or subclass divisions after discovery.

107.    Excluded from the Class are: (i) any judge presiding over this action and their family members; (ii) Nellie's, its subsidiaries, successors, or any entity in which Nellie's or Pete and Gerry's or its parent companies may have a controlling

---

[1]  Plaintiffs also seek relief under New York state common law fraud that is subject to a six year statute of limitations.

interest, Nellie's current or former employees, officers, or directors; (iii) persons that properly exclude themselves from the Class; and (iv) the legal representatives, successors, or assignees of any properly excluded persons.

108.    Numerosity. The potential Class members as defined are so numerous and diversely located throughout the U.S. that joinder of all Class members is impracticable. While the exact number of Class members is unknown because such information is in the exclusive control of Nellie's and retailers that sell its eggs, upon information and belief, the Class is greater than 100 individuals.

109.    Commonality. There are questions of law and fact common to Plaintiffs and the Class that predominate over any questions affecting only individual Class members. These common questions of law and fact include, inter alia, whether:

- Nellie's violated New York's General Business Law § 349;

- Nellie's violated New York's General Business Law § 350;

- Nellie's engaged in, and continues to engage in, unlawful, fraudulent, and unfair practices that are substantially likely to mislead the public, and therefore members of the Class;

- Nellie's has engaged in and continues to engage in unlawful, fraudulent, and unfair practices, including by representing to the public, and Class members, that it provides eggs from laying hens that are raised humanely, with adequate outdoor access and space;

- Nellie's fraudulently and unfairly misrepresents to Class members that Nellie's had the ability to and would in fact ensure that it provides

eggs from hens that are raised humanely, with adequate outdoor access and space;

- Nellie's fraudulent and unfair misrepresentations to Class members allowed Nellie's to cover up its horrific and cruel treatment of laying hens such that Nellie's has committed fraud against consumers and the public;

- Nellie's deceptive conduct resulted in profits and pecuniary gain received from consumers, including Class members;

- Class members are entitled to damages under New York state consumer laws;

- Declaratory and injunctive relief is available in this action;

- Plaintiffs and Class members are entitled to injunctive relief, attorneys' fees, and costs; and

- Class members are entitled to equitable or any other forms of relief.

110.    Typicality. Plaintiffs' claims are typical of the claims of the Class. Plaintiffs and Class members were exposed and subjected to Nellie's uniform practices and policies surrounding its representations to the public it provides eggs from hens that are raised humanely, with adequate outdoor access and space, that has resulted in, and will continue to cause, irreparable harm but for immediate action by the Court.

111.    Adequacy of Representation. Plaintiffs will fairly and adequately represent and protect the interests of the Class members. Plaintiffs' counsels are competent and experienced in litigating class actions.

112.    Superiority of Class Action. A class action is superior to other available methods for the fair and efficient adjudication of this controversy because joinder of all of the Class members is impracticable. Furthermore, the adjudication of this controversy through a class action will avoid the possibility of inconsistent and potentially conflicting adjudication of the asserted claims. There will be no difficulty in the management of this action as a class action.

113.    Injunctive and Declaratory Relief. Nellie's practices are uniform as to all Class members. Nellie's has acted or refused to act on grounds that apply generally to the Class, so that final injunctive or declaratory relief is appropriate with respect to the Class as a whole.

## CAUSES OF ACTION

### First Cause of Action: Violations of the General Business Law § 349

114.    Plaintiffs incorporate by reference all allegations of the Complaint.

115.    Defendants' acts and practices are not unique to the parties and have a broader impact on the public.

116.    Defendants' portrayal of chickens on cartons of Nellie's eggs as leading happy, healthy, and low-stress lives on small farms in which they can freely roam was, and continues to be, false and misleading. The truth is that Defendants offer many chickens only short and miserable lives during which—if they are not

violently killed shortly after birth—they are mutilated, live in severely over-crowded conditions, lack sufficient space to engage in instinctive and vital behaviors, lack viable access to the outdoors, are constantly under extreme stress, and are painfully malnourished before being sold off to painful and distressing deaths.

117.    At all times during which Defendants made the above-referenced representations to Plaintiffs, and to the public, Defendants knew, or were willful in not knowing, that they were false and misleading in the manner referenced above.

118.    The above-referenced representations were material facts that Plaintiffs relied on, paying premium prices for Nellie's eggs that Defendants would not have been able to charge absent the above-referenced representations. Plaintiffs did not receive all that they bargained for.

119.    As a result, Plaintiffs have suffered damages in an amount to be determined at trial.

120.    Plaintiffs further seek to enjoin such unlawful deceptive acts and practices described above. Unless the unlawful actions of Defendants are enjoined, Defendants will continue to deceptively portray their chickens as leading happy, healthy, and low-stress lives on small farms in which they can freely roam.

**Second Cause of Action: Violations of the General Business Law § 350**

121.    Plaintiffs incorporate by reference all allegations of the Complaint.

122.    Defendants' acts and practices are not unique to the parties and have a broader impact on the public.

123.    Defendants' portrayal of chickens on cartons of Nellie's eggs as leading happy, healthy, and low-stress lives on small farms in which they can freely roam was, and continues to be, false and misleading. The truth is that Defendants offer many chickens only short and miserable lives during which—if they are not violently killed shortly after birth—they are mutilated, live in severely over-crowded conditions, lack sufficient space to engage in instinctive and vital behaviors, lack viable access to the outdoors, are constantly under extreme stress, and are painfully malnourished before being sold off to painful and distressing deaths.

124.    At all times during which Defendants made the above-referenced representations to Plaintiffs, and to the public, Defendants knew, or were willful in not knowing, that they were false and misleading in the manner referenced above.

125.    The above-referenced representations were material facts that Plaintiffs relied on, paying premium prices for Nellie's eggs that Defendants would not have been able to charge absent the above-referenced representations. Plaintiffs did not receive all that they bargained for.

126.    As a result, Plaintiffs have suffered damages in an amount to be determined at trial.

127.    Plaintiffs further seek to enjoin such unlawful deceptive acts and practices described above. Unless the unlawful actions of Defendants are enjoined, Defendants will continue to deceptively portray their chickens as leading happy, healthy, and low-stress lives on small farms in which they can freely roam.

### **Third Cause of Action: Fraud**

128.    Plaintiffs incorporate by reference all allegations of the Complaint.

129.    Defendants' portrayal of chickens on cartons of Nellie's eggs as leading happy, healthy, and low-stress lives on small farms in which they can freely roam was, and continues to be, false and misleading. The truth is that Defendants offer many chickens only short and miserable lives during which—if they are not violently killed shortly after birth—they are mutilated, live in severely over-crowded conditions, lack sufficient space to engage in instinctive and vital behaviors, lack viable access to the outdoors, are constantly under extreme stress, and are painfully malnourished before being sold off to painful and distressing deaths.

130.    At all times during which Defendants made the above-referenced representations to Plaintiffs, and to the public, Defendants knew, or were reckless or willful in not knowing, that they were false and misleading in the manner referenced above.

131.    Despite this knowledge, Defendants persisted in their false portrayals on cartons of Nellie's eggs because these portrayals permit them to sell Nellie's eggs to caring consumers, and to sell them for more than they would otherwise, maximizing sales and profit at the expense of duped consumers, including Plaintiffs.

132.    The above-referenced representations were material facts that Plaintiffs relied on, paying premium prices for Nellie's eggs that Defendants would

not have been able to charge absent the above-referenced representations. Plaintiffs did not receive all that they bargained for.

133.   As a result, Plaintiffs have suffered damages in an amount to be determined at trial.

134.   Defendants are additionally liable for punitive or exemplary damages for their reckless, wanton, and willful disregard for plaintiffs'—and other consumers'—right not to be misled in making humane purchasing decisions. Defendants' conduct in this regard is so gross and outrageous as to evidence a high degree of moral turpitude and demonstrate such a contempt for consumers, including Plaintiffs, as to imply criminal indifference to civil obligations. Defendants' conduct is directed toward the public generally, and warrants the imposition of punitive and exemplary damages against Defendants.

## Fourth Cause of Action: Fraudulent Misrepresentation

135.   Plaintiffs incorporate by reference all allegations of the Complaint.

136.   Defendants' portrayal of chickens on cartons of Nellie's eggs as leading happy, healthy, and low-stress lives on small farms in which they can freely roam was, and continues to be, false and misleading. The truth is that Defendants offer many chickens only short and miserable lives during which—if they are not violently killed shortly after birth—they are mutilated, live in severely over-crowded conditions, lack sufficient space to engage in instinctive and vital behaviors, lack viable access to the outdoors, are constantly under extreme stress,

and are painfully malnourished before being sold off to painful and distressing deaths.

137.   At all times during which Defendants made the above-referenced representations to Plaintiffs, and to the public, Defendants knew, or were reckless or willful in not knowing, that they were false and misleading in the manner referenced above.

138.   Despite this knowledge, Defendants persisted in their false portrayals on cartons of Nellie's eggs because these portrayals permit them to sell Nellie's eggs to caring consumers, and sell them for more than they would otherwise, maximizing sales and profit at the expense of duped consumers, including Plaintiffs.

139.   The above-referenced representations were material facts that Plaintiffs relied on, paying premium prices for Nellie's eggs that Defendants would not have been able to charge absent the above-referenced representations. Plaintiffs did not receive all that they bargained for.

140.   As a result, Plaintiffs have suffered damages in an amount to be determined at trial.

141.   Defendants are additionally liable for punitive or exemplary damages for their reckless, wanton, and willful disregard for Plaintiffs'—and other consumers'—right not to be misled in making humane purchasing decisions. Defendants' conduct in this regard is so gross and outrageous as to evidence a high degree of moral turpitude and to demonstrate such a contempt for consumers, including Plaintiffs, as to imply criminal indifference to civil obligations.

Defendants' conduct is directed toward the public generally, and warrants the imposition of punitive and exemplary damages against Defendants.

### Fifth Cause of Action: Breach of Express Warranty

142.   Plaintiffs incorporate by reference all allegations of the Complaint.

143.   Cartons of Nellie's eggs contain affirmations, via the words and images referenced above, that Defendants provide chickens happy, healthy, and low-stress lives on small farms in which they can freely roam.

144.   These affirmations were and are false. The truth is that Defendants offer many chickens only short and miserable lives during which—if they are not violently killed shortly after birth—they are mutilated, live in severely over-crowded conditions, lack sufficient space to engage in instinctive and vital behaviors, lack viable access to the outdoors, are constantly under extreme stress, and are painfully malnourished before being sold off to painful and distressing deaths.

145.   The above-referenced affirmations were material facts that Plaintiffs relied on, paying premium prices for Nellie's eggs that Defendants would not have been able to charge absent the above-referenced representations. Plaintiffs did not receive all that they bargained for.

146.   As a result, Plaintiffs have suffered damages in an amount to be determined at trial.

147.   Defendants are additionally liable for punitive or exemplary damages for their reckless, wanton, and willful disregard for Plaintiffs'—and other

consumers'—right not to be misled in making humane purchasing decisions. Defendants' conduct in this regard is so gross and outrageous as to evidence a high degree of moral turpitude and to demonstrate such a contempt for consumers, including Plaintiffs, as to imply criminal indifference to civil obligations. Defendants' conduct is directed toward the public generally, and warrants the imposition of punitive and exemplary damages against Defendants.

## JURY DEMAND AND PRAYER FOR RELIEF

Plaintiffs demand a jury trial on all issues.

Plaintiffs pray for relief as follows:

1.      Enter a declaration that Defendants have committed the violations of law alleged herein;

2.      Enter an injunction and order permanently restraining Defendants from engaging in such unlawful conduct;

3.      Enter a permanent injunction directing Defendants cease selling Nellie's eggs using product packaging that (i) includes the following terms and variations thereof: love, kindness, better lives, green grass, or freedom for hens to roam where they please; (ii) includes images of hens indoors with more than 1.2 square feet of floor space per hen; and (iii) includes images of hens outdoors;

4.      Declare this action to be maintainable as a class action pursuant to Fed. R. Civ. P. 23, and designate Plaintiffs as representatives of their Class, and their counsel of record as Class counsel.

5.      Award compensatory damages as requested herein;

6.      Award punitive and exemplary damages as requested herein, in an amount sufficient to punish Defendants and deter others from similar wrongdoing;

7.      Enter judgment for interest at the legal rate on the foregoing sums;

8.      Enter judgment for costs and attorneys' fees, including litigation expenses reasonably incurred in the prosecution of the action; and

9.      Award any and all other general and equitable relief as this Court may deem just and proper.

Dated: March 6, 2019
     New York, New York

Respectfully submitted,

**WIGDOR LLP**

By: _____
    Jeanne M. Christensen
    Julia Elmaleh-Sachs

85 Fifth Avenue
New York, NY 10003
Telephone: (212) 257-6800
Facsimile: (212) 257-6845
jchristensen@wigdorlaw.com
jelmaleh-sachs@wigdorlaw.com

Asher Smith
PETA FOUNDATION
1536 16th Street, NW
Washington, DC 20036
Telephone: (202) 483-7382
Facsimile: (202) 540-2208
AsherS@petaf.org
(*application forthcoming*)

*Counsel for Plaintiffs*