**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-------------------------------------------------------------- X

MICHELLE LUGONES, TRICIA RIZZI, MARCUS     :
SIEZING, CLAUDIA VASSALLO, DENISE          :     Civil Case No.: 19-cv-02097
ALVARADO, MINOEE MODI, ISABELLE GRAY,      :
KARINE SEWELL, and SONJA ROMANO,           :
Plaintiffs, on behalf of themselves and as proposed   :     **SECOND AMENDED CLASS**
class representatives of a Class of similarly situated   :     **ACTION COMPLAINT**
individuals, and                           :
                                           :
ANNE FLOURNOY,                             :
   Plaintiff and member of the putative Class,   :     **Jury Trial Demanded**
                                           :
                                           :
                  v.                       :
                                           :
PETE AND GERRY'S ORGANICS, LLC and         :
NELLIE'S FREE RANGE EGGS,                   :
                                           :
                  Defendants.              :
                                           :
                                           :
-------------------------------------------------------------- X

Plaintiffs Michelle Lugones, Tricia Rizzi, Marcus Siezing, Claudia Vassallo, Denise
Alvarado, Minoee Modi, Isabelle Gray, Karine Sewell, and Sonja Romano individually, and as
proposed class representatives on behalf of a similarly situated Class (the "Class" or
"Plaintiffs"), and Anne Flournoy, individually and as a member of the putative Class, by and
through their undersigned counsel, as and for their Complaint against Defendants Pete and
Gerry's Organics, LLC, and Nellie's Free Range Eggs ("Nellie's" or "Defendants"), hereby
allege as follows:

## SUMMARY OF CLAIMS

1.      The sale of eggs is big business. In 2014, total egg production value in the U.S.
was more than **10 billion dollars**.  In the last 20 years, *per capita* consumption has increased

annually as more Americans turn to eggs for an affordable source of protein.  The egg industry has reaped billions in profits.

2.      Some of the biggest benefactors from this boom are egg sellers that deliver eggs to consumers who seek assurances of consideration for the welfare of laying hens.  Millions of consumers spend more money to buy eggs produced by laying hens that they believe to be treated more humanely than commercial-scale operations that intensively confine tens of thousands of hens indoors.

## I.      Nellie's Eggs: Profits over Truth

3.      A lie has two parts: (i) the intent to lie and (ii) the failure to notify the one being lied to of the deception.  Nellie's knowingly lied to Plaintiffs and potential Class members and perpetuated their deception through the sale of falsely advertised eggs to millions of consumers in order to pad their bottom line.

4.      Nellie's is one of the largest sellers of eggs from self-described "free range" laying hens.  Based on Nellie's self-presentation, via slogans and images on each carton of Nellie's eggs invoking love and green grass, consumers reasonably believe that Nellie's "free range" hens have meaningful access to the outdoors to range and forage.

5.      It is against this backdrop that Nellie's successfully dupes consumers into paying higher prices for its eggs.  With an agreement to supply all eggs to the Boston Red Sox for the 2019 baseball season, and reported revenue of $177 million in 2017, Nellie's is poised for record returns in 2019.

6.      As detailed below, Plaintiffs believed they were buying and eating eggs from laying hens that move around outside, forage in grass, and enjoy freedom from unnecessary pain and distress.  They believed this because it is what Nellie's told them by advertising that it is

selling eggs from "free range" hens provided "love," "kindness," "better lives," "green grass," and "blue skies."  Likewise, on Nellie's website, Nellie's "**<u>guarantees</u>** . . . [laying hens] have easy access to the outdoors with real grass to peck, play and dust bathe." (emphasis added).

7.      Nothing could be further from the truth.  The harsh reality is that Nellie's crams and stuffs hens—sensitive, intelligent animals, who feel pain acutely and who in natural environments will form complex social bonds—into sheds up to 20,000 at a time.   This overcrowding prevents them from extending their wings, foraging or making their way to the outdoor space Nellie's advertises so prominently.  Such confinement leads to stress and trauma that in turn causes them further pain in the form of fighting, feather pecking and self-mutilation.

**What Nellie's advertises to be**



**What Nellie's claims it is not**          **Nellie's actual supplier**



8.      To eke out profits from hens kept in these conditions, Nellie's condones the systematic mutilation of laying hens' beaks.  This mutilation causes lifelong pain and suffering and inhibits natural behaviors.  These mutilated, crowded hens then lay an egg once a day, every day, for thirteen months.  After only thirteen months, these hens are broken down and depleted

of the calcium needed to lay eggs strong enough to make it to market.  Once their value to Nellie's declines, Nellie's sells them to slaughterhouses and live markets that kill them, scared and in pain, alongside hens raised by sellers whose practices Nellie's tells consumers they are avoiding.

9.      Consumers pay more for Nellie's eggs than eggs advertised without the same vivid slogans, descriptions and imagery regarding animal welfare.  Other egg producers that keep tens of thousands of hens intensively confined indoors do not advertise their "free range" eggs alongside slogans, descriptions and images invoking "love," "kindness," "better lives," "green grass," and "blue skies."

10.     Consumers pay more because of Nellie's lies.   These lies violate consumer protection laws and subject Nellie's to monetary penalties and equitable and injunctive orders. Nellie's must cease falsely advertising the degree of outdoor access, foraging, love, kindness, better lives, green grass and humane treatment it provides laying hens or else treat hens as advertised.

11.     Nellie's fictions of outdoor foraging, green grass, blue skies, and love and kindness are exposed.  Plaintiffs refuse to allow this con to continue.

## JURISDICTION AND VENUE

12.     The jurisdiction of this action arises under diversity of citizenship, which is codified pursuant to 28 U.S.C. § 1332 because there is diversity of residence of the named parties.  Plaintiffs Michelle Lugones, Tricia Rizzi, Marcus Siezing, Claudia Vassallo and Anne Flournoy are citizens and residents of New York.  Plaintiff Denise Alvarado is a citizen and resident of California.  Plaintiff Karine Sewell is a citizen and resident of Maryland.  Plaintiff Minoee Modi is a citizen and resident of Massachusetts.  Plaintiff Isabelle Gray is a citizen and

resident of Georgia.   Plaintiff Sonja Romano is a citizen and resident of North Carolina. Defendants are residents of and incorporated in New Hampshire, and this action involves an amount in controversy in excess of $75,000, exclusive of interest and costs.   The Court also has jurisdiction pursuant to the Class Action Fairness Act, 28 U.S.C. § 1332(d), because the proposed Class has more than 100 members, contains at least one member of diverse citizenship from Defendants, and the amount in controversy exceeds $5 million.

13.    The Court has personal jurisdiction over Defendants because they conduct business in New York and a substantial portion of the events and omissions giving rise to this action took place in New York, New York.  By way of only one example supporting the Court's personal jurisdiction over Defendants, they market and sell thousands, if not millions, of eggs throughout New York and Manhattan on a daily basis.  Plaintiffs purchased eggs from Nellie's in stores located in Manhattan as well as other parts of New York.   The deceptive practices, misrepresentations and omissions alleged herein were contained on Nellie's packaging and cartons of eggs sold on a daily basis uniformly to consumers throughout New York.

14.    Venue is proper in the Southern District of New York pursuant to 28 U.S.C. § 1391 because a substantial part of the events and omissions giving rise to this action occurred in this district, and because Defendants operate and conduct business in this district on a regular and daily basis.

15.    On April 29, 2019, Plaintiffs mailed notice letters to Defendants in accordance with the procedural notice requirements of the Massachusetts Consumer Protection Act, Mass. Gen. Laws Ann. ch. 93A §§1, *et seq.* and Georgia's Fair Business Practices Act, Ga. Code Ann. § 10-1-390, *et seq.*

## PARTIES

16.     Plaintiffs and proposed class representatives **Michelle Lugones** and **Marcus Siezing**, husband and wife domiciled in New York, strive to make ethical purchasing decisions. To them, humane treatment of animals is a priority. Marcus, for example, grew up spending his summers on a farm.  Convinced by the images and words seen on cartons of Nellie's eggs, they both purchased Nellie's eggs from their local Whole Foods in Tribeca, New York.  Together, they purchased them regularly between 2017 and 2018.   Before purchasing Nellie's eggs, Michelle and Marcus relied on a combination of slogans, descriptions, and images including:

- "WE LOVE OUR HENS, YOU'LL LOVE OUR EGGS"

- "WE LOVE OUR HENS"

- Claims that "[m]ost hens don't have it as good as Nellie's," and that in contrast to deceptively-labeled "cage-free" eggs, Nellie's hens "can peck, perch, and play on plenty of green grass."

- Images consistent with those on Carton Panels B and C (as shown in paragraph 46).

Encouraged by Defendants' product packaging, Michelle and Marcus believed themselves to be purchasing eggs sourced from small farms providing all chickens with space to move around both indoors and outdoors, as well as freedom from chick culling, beak-cutting, calcium depletion and sale to commercial slaughterhouses and live markets.  A check of Defendants' website reinforced these representations. But had they known the truth, Michelle and Marcus would not have paid premium prices for Nellie's eggs.  Michelle and Marcus would only consider purchasing Nellie's eggs in the future if Defendants were to treat chickens in a manner consistent with their advertising.

17.     Plaintiff and proposed class representative **Tricia Rizzi,** domiciled in New York, purposefully spends more on eggs in order to ensure she is supporting humane animal husbandry practices.  Every animal, in Tricia's view, should be able to feel like an animal in his or her natural environment.  After first seeing the advertising on cartons of Nellie's eggs more than five years ago, Tricia regularly purchased Nellie's eggs from a number of stores in her hometown of Massapequa, New York.  She encouraged her friends to do the same.  Before purchasing Nellie's eggs, Tricia relied on a combination of slogans, descriptions, and images including:

- "WE LOVE OUR HENS, YOU'LL LOVE OUR EGGS"

- "WE LOVE OUR HENS"

-  "BETTER LIVES FOR HENS MEAN BETTER EGGS FOR YOU!"

- Images consistent with those on Carton Panels B, C, and D (as shown in paragraph 46).

Because of these slogans and images—particularly the use of slogans and images invoking "love"—Nellie's eggs were the only ones that gave Tricia the impression they came from loving family farms that offered chickens freedom to roam inside and outdoors, as well as freedom from chick culling, beak-cutting, calcium depletion and sale to commercial slaughterhouses and live markets.  Had she known the truth, Tricia would not have paid premium prices for Nellie's eggs.  Tricia would only consider purchasing Nellie's eggs in the future if Defendants were to treat chickens in a manner consistent with their advertising.

18.     Plaintiff and proposed class representative **Claudia Vassallo**, domiciled in New York, is one of the friends Tricia encouraged to purchase Nellie's eggs.   Before purchasing Nellie's eggs, Claudia relied on a combination of slogans, descriptions, and images including:

- "WE LOVE OUR HENS, YOU'LL LOVE OUR EGGS"

- "WE LOVE OUR HENS"

-  "BETTER LIVES FOR HENS MEAN BETTER EGGS FOR YOU!"

- "OUTDOOR FORAGE"

- Claims that "[m]ost hens don't have it as good as Nellie's," and that in contrast to deceptively-labeled "cage-free" eggs, Nellie's hens "can peck, perch, and play on plenty of green grass."

- Images consistent with those on Carton Panels B and C (as shown in paragraph 46).

Because of these and other images and descriptions on each carton of Nellie's eggs—particularly those slogans and images invoking "love" and "kindness"—Claudia believed Nellie's offered chickens freedom to roam inside and outdoors, as well as freedom from chick culling, beak-cutting, calcium depletion and sale to commercial slaughterhouses and live markets.  Claudia purchased Nellie's eggs for more than three years.  If she had known the truth—that, for example, instead of having the ability to roam freely outdoors, Defendants source their eggs from farms that cram approximately 20,000 hens into an over-crowded shed—she would never have paid premium prices for Nellie's eggs.  Claudia would only consider purchasing Nellie's eggs in the future if Defendants were to treat chickens in a manner consistent with their advertising.

19.     Plaintiff and proposed class representative **Denise Alvarado**, domiciled in California, believed Nellie's to be a humane and uniquely caring egg producer. Denise bought Nellie's eggs exclusively for several years at a Safeway in Petaluma, California. Before purchasing Nellie's eggs, Denise relied on a combination of slogans, descriptions, and images including:

- "WE LOVE OUR HENS, YOU'LL LOVE OUR EGGS"

- "WE LOVE OUR HENS"

- Claims that "[m]ost hens don't have it as good as Nellie's," and that in contrast to deceptively-labeled "cage-free" eggs, Nellie's hens "can peck, perch, and play on plenty of green grass."

- Images consistent with those on Carton Panels B and C (as shown in paragraph 46).

A lifelong lover of animals, Denise does not eat meat and is extremely careful about choosing humanely sourced products.  By purchasing eggs from a company that claimed to "love" its hens—and by encouraging friends to do the same—Denise believed that she was supporting an egg seller that provided chickens freedom to roam with access to grass, and freedom from chick culling, beak-cutting, calcium depletion and sale to commercial slaughterhouses and live markets.  Had she known the truth—that Nellie's crams hens into over-crowded sheds where they suffer—she would not have paid premium prices for Nellie's eggs.  Denise would only consider purchasing Nellie's eggs in the future if Defendants were to treat chickens in a manner consistent with their advertising.

20.     Plaintiff and proposed class representative **Minoee Modi**, domiciled in Massachusetts, is transitioning to veganism.  She no longer eats meat or milk, and seeks out egg sellers that she believes raise hens humanely.  Before purchasing Nellie's eggs, Minoee relied on a combination of slogans, descriptions, and images including:

- "WE LOVE OUR HENS, YOU'LL LOVE OUR EGGS"

- "WE LOVE OUR HENS"

- "BETTER LIVES FOR HENS MEAN BETTER EGGS FOR YOU!"

- Images consistent with those on Carton Panels A and B (as shown in paragraph 46).

Because of these claims of "better lives" and "love," as well as imagery depicting loving human interactions with hens, Minoee was led to believe Nellie's was making a higher promise than just

"cage free" or "free range."  Instead, Minoee believed she had found an egg seller that treated chickens like companion animals in a family, providing them freedom to roam with access to grass as well as freedom from chick culling, beak-cutting, calcium depletion, sale to commercial slaughterhouses and live markets, and from any other actions inconsistent with a common sense understanding of love.  This trust in Nellie's advertising was reinforced by Nellie's premium prices.  Had she known the truth, Minoee would not have paid Nellie's premium prices.  Minoee would only consider purchasing Nellie's eggs in the future if Defendants were to treat chickens in a manner consistent with their advertising.

21.    Plaintiff and proposed class representative **Isabelle Gray**, domiciled in Georgia, chooses to spend more money from her limited budget in order to purchase eggs from hens who she believes live more natural lives.  She does not believe hens are meant to live crammed together in a shed.  Before purchasing Nellie's eggs, Isabelle relied on a combination of slogans, descriptions, and images including:

- "WE LOVE OUR HENS, YOU'LL LOVE OUR EGGS"

- "WE LOVE OUR HENS"

-  "BETTER LIVES FOR HENS MEAN BETTER EGGS FOR YOU!"

- Images consistent with those on Carton Panels A, B, C and D (as shown in paragraph 46).

These representations convinced Isabelle that Nellie's allowed chickens to live in more natural environments, with viable access to fresh air and open pastures and freedom from chick culling, beak-cutting, calcium depletion and sale to commercial slaughterhouses and live markets. Isabelle's trust in Nellie's advertising was reinforced by visits to Nellie's website, where she saw additional videos, images and descriptions with these same messages.  Had she known the truth,

Isabelle would not have paid premium prices for Nellie's eggs.  Isabelle would only consider purchasing Nellie's eggs in the future if Defendants were to treat chickens in a manner consistent with their advertising.

22.    Plaintiff and proposed class representative **Karine Sewell,** domiciled in Maryland, grew up playing with hens in her grandmother's backyard.  When she saw the images on Nellie's cartons of a little girl holding hens outside, she was reminded of her own childhood. Before purchasing Nellie's eggs, Karine relied on a combination of slogans, descriptions, and images including:

- "WE LOVE OUR HENS, YOU'LL LOVE OUR EGGS"

- "WE LOVE OUR HENS"

- Claims that "[m]ost hens don't have it as good as Nellie's," and that in contrast to deceptively-labeled "cage-free" eggs, Nellie's hens "can peck, perch, and play on plenty of green grass."

- Images consistent with those on Carton Panels B, C, and D (as shown in paragraph 46).

These images, slogans, and descriptions led Karine to purchase Nellie's eggs at Safeway and Food Lion in Waldorf, Maryland for years.  Because of Nellie's slogans and images invoking "love," she believed that the chickens lived in small farms like her grandmother's—not trapped in a packed shed, and with freedom from chick-culling, beak-cutting, calcium depletion and sale to commercial slaughterhouses and live markets.  Had she known the truth, Karine would never have paid premium prices for Nellie's eggs.  Karine would only consider purchasing Nellie's eggs in the future if Defendants were to treat chickens in a manner consistent with their advertising.

23.     Plaintiff and proposed class representative **Sonja Romano**, domiciled in North Carolina, began purchasing Nellie's eggs in Davidson, North Carolina after her daughter expressed interest in vegetarianism due to her love of animals.  Sonja, along with her daughter, put in effort to learn more about where their food comes from.  Before purchasing Nellie's eggs, Sonja relied on a combination of slogans, descriptions, and images including:

- "WE LOVE OUR HENS, YOU'LL LOVE OUR EGGS"

- "WE LOVE OUR HENS"

-  "BETTER LIVES FOR HENS MEAN BETTER EGGS FOR YOU!"

- Claims that "[m]ost hens don't have it as good as Nellie's," and that in contrast to deceptively-labeled "cage-free" eggs, Nellie's hens "can peck, perch, and play on plenty of green grass."

- Images consistent with those on Carton Panels A, B, and D (as shown in paragraph 46).

Sonja and her daughter were led to believe Nellie's gives chickens love, the realistic opportunity to forage outside, and freedom from culling, beak-cutting, calcium depletion and sale to commercial slaughterhouses and live markets.  Had she known the truth, Sonja would never have paid premium prices for Nellie's eggs. Sonja would only consider purchasing Nellie's eggs in the future if Defendants were to treat chickens in a manner consistent with their advertising.

24.     Plaintiff and member of the putative Class, **Anne Flournoy**, is domiciled in New York and has been passionate about buying eggs laid by hens raised humanely since gathering eggs from her grandfather's farm as a child.  Anne purchases Nellie's eggs in Greenwich, New York to supplement the eggs she purchases from local farms and the produce she and her

- 12 -

husband grow in their home garden.   Before purchasing Nellie's eggs, Anne relied on a combination of slogans, descriptions, and images including:

- "WE LOVE OUR HENS, YOU'LL LOVE OUR EGGS"

- "WE LOVE OUR HENS"

- Claims that "[m]ost hens don't have it as good as Nellie's," and that in contrast to deceptively-labeled "cage-free" eggs, Nellie's hens "can peck, perch, and play on plenty of green grass."

- Images consistent with those on Carton Panels B and C (as shown in paragraph 46).

These slogans, images and descriptions reminded her of her grandfather's farm.  The little girl hugging a hen on cartons of Nellie's eggs was reminiscent of Anne's relationship to her grandfather's hens.  As a result of this advertising—and the prominent use of the word "love"— Anne imagined Nellie's sourced its eggs from similar small farms, where chickens would have freedom to roam, as well as freedom from chick culling, beak-cutting, calcium depletion and sale to commercial slaughterhouses and live markets.  Had she known the truth, Anne would never have paid premium prices for Nellie's eggs.  Anne would only consider purchasing Nellie's eggs in the future if Defendants were to treat chickens in a manner consistent with their advertising.

25.   **Pete and Gerry's Organics, LLC** is a New Hampshire limited liability company headquartered in Monroe, New Hampshire.  Pete and Gerry's is one of the nation's largest sellers of eggs, with $177 million in reported sales revenue in 2017.  The "Gerry" in Pete and Gerry's is Gerry LaFlamme.  The "Pete" is Pete Stanton.  Mr. Stanton is a cousin of Gerry LaFlamme's wife.  Jesse LaFlamme, the son of Gerry LaFlamme, is an owner and the CEO of Pete and Gerry's Organics, LLC.

26.     **Nellie's Free Range Eggs** is an entity controlled by Pete and Gerry's Organics, LLC and has the same corporate address.  Pete and Gerry's Organics, LLC uses the Nellie's Free Range Eggs corporate identity to conduct various businesses, including a new partnership with the Boston Red Sox.  Jesse LaFlamme also heads Nellie's Free Range Eggs.

27.     Defendants sell Nellie's eggs in more than 9,600 retailers across the country.  As of 2017, Nellie's represented that it produces its eggs through a network of "family" farms located in 12 states, including New York, Pennsylvania, New Jersey and Vermont.

28.     Defendants represent that Nellie's produces millions of cartons of eggs a year.  Upon information and belief, the eggs sell for between $4 and $6, or more, a carton.

## BACKGROUND AND FACTUAL ALLEGATIONS

### I.     Chickens Are Sensitive, Inquisitive Animals Who Suffer if They Cannot Meet Their Physical, Behavioral and Social Needs

29.     Chickens are highly sensitive and inquisitive animals.

30.     Young chicks are capable of discriminating quantities and grasping simple arithmetic concepts.  For example, days-old chicks can identify the larger between sets of different numbers of objects.  When tested, they retain this ability even after testers hid the objects behind opaque screens.  This suggests chicks are capable of simple addition and subtraction.

31.     Young chicks also exhibit varying degrees of object permanence—the ability to understand objects continues to exist even when they cannot perceive those objects.  For example, days-old chicks retain the ability to tell the difference between shapes that are missing pieces and shapes that are merely partially hidden.  Some chicks are even able to comprehend the continued existence of objects that have been completely hidden—an even more advanced form of object permanence.

32.     Adult chickens are capable of even more cognitively and emotionally complex achievements.  For example, chickens can perceive and predict time intervals.  When encouraged to peck at a computer screen in six-minute intervals in order to receive food, chickens show they can estimate the passage of time by increasing their pecking frequency around the six-minute mark.

33.     Chickens can also rationally discriminate between future outcomes and resist instant gratification to optimize future reward.  When given a choice between a two-second delay followed by access to food for three seconds and a six-second delay followed by access for 22 seconds, chickens can hold out for the larger reward.

34.     Chickens likely retain short-term episodic memories.  This is suggested both by the cognitive abilities described above and by more direct testing.  For example, chickens can remember the trajectory of a hidden ball for up to 180 seconds.

35.     Chickens are capable of empathy—the ability to be affected by and share the emotional state of others.  Hens watching their chicks exposed to even mildly negative stimuli (such as air puffs) vocalize in distress, spend less time grooming their feathers and more time standing alert, exhibit an increase in heart rate and exhibit lower eye and comb temperatures (indicating constricted blood vessels and increased body core temperature).  Hens exhibit similar responses even when they cannot hear the chicks' distressed vocalizations.  This suggests the hens can logically apply their knowledge of the unpleasant nature of air puffs.

36.     Chickens pass cultural knowledge amongst themselves.  Hens presented with a mixture of safe yellow and tainted blue corn kernels actively steer their chicks to yellow kernels.  Hens who observe trained peers peck one of two keys for food learn to peck the same key.

37.     Chickens are acutely sensitive to temperature, pressure and pain.  Accordingly, chickens have evolved a number of instinctive behaviors that are essential to their well-being.  They preen their feathers (run their feathers through their beaks) to improve the feathers' ability to provide insulation.  They "dust bathe" (roll or move around in dirt) to clean their skin and feathers.  They "roost" (perch on high surfaces) in order to feel safe.  They spend significant amounts of time foraging, exploring and pecking at food sources on natural ground.  Because chickens cannot perspire, they cool themselves by dunking their beaks in cold water or extending and flapping their wings to ventilate their bodies and separate their feathers.

38.     Unsurprisingly, given their cognitive, emotional, and physical abilities and needs, chicken social interactions and hierarchies are complex.  Hens and chicks begin calling to each other before the chicks have hatched.  Mature chicken communication consists of at least twenty-four distinct vocalizations and a variety of displays.  Chicken communication is "referential"—meaning that chickens modify their vocalizations and displays in order to convey information to others.  For example, chickens will issue alarm calls of differing pitch and duration depending on both the type of predator and type of chickens present.  A male chicken is more likely to issue an alarm call signaling aerial predators when hens are present.  Chicken communication also demonstrates awareness of the perspectives of other animals—chickens will give longer alarm calls when under cover of a tree or bush, suggesting they understand the aerial predator cannot see them.

39.     Each chicken is an individual with a distinct personality.  Like humans, chickens can be more or less outgoing, brave, shy, fearful or aggressive.  Chickens' personality quirks shape their interactions with other chickens.  When placed together for the first time in reasonably sized social groupings, hens establish dominance hierarchies (called "pecking

orders").  Chickens can recognize individuals, and distinguish which chickens are—or are not—part of their social group.  When placed in new social groups, hens observe relationships between other hens and apply this information logically in order to inform their own interactions.

40.     Provided with enough space and areas in which to efficiently escape or hide, hens of a wide variety of personality types can harmoniously navigate the social dynamics of a reasonably sized flock.  The less space available, the more stressed hens become in establishing and maintaining social dynamics and securing access to resources such as food, water, roosts and space.  Hens suffer physically and mentally if they have no efficient way to escape hens that are more aggressive.

## II.     Defendants Design Their Egg Cartons to Attract Consumers Who Care About Animal Welfare

41.     A growing population of American consumers believes it is important that the food industry treat farmed animals—including chickens—humanely.  Many of these consumers base their purchasing decisions on animal welfare.  These consumers are willing to spend more if it means that food sellers source their products from animals treated humanely.  The food industry is well aware of, and monitors and reports on, this trend.

42.     Because of this, Nellie's intentionally attempts to distinguish itself from other large egg producers in the U.S.

43.     Defendants, under the Nellie's corporate identity, design their egg cartons to appeal to these consumers.  For example, cartons of Nellie's eggs are emblazoned with a variety of the following cheerful slogans and representations of animal care:

- "WE LOVE OUR HENS, YOU'LL LOVE OUR EGGS"

- "WE LOVE OUR HENS"

- "THEY ROAM WHERE THEY PLEASE"

- "BETTER LIVES FOR HENS MEAN BETTER EGGS FOR YOU!"

- "THE GRASS IS GREENER WHEN THERE IS ACTUALLY GRASS"

- "A KINDER KIND OF EGG"

- "BLUE SKY ABOVE, GREEN GRASS BELOW. JUST LIVIN' THE DREAM."

- "OUTDOOR FORAGE"

44.     The cartons also come with paragraph-length explanations of how Nellie's eggs are better—kinder—than the competition.  For example, in explaining to consumers why "[m]ost hens don't have it as good as Nellie's," many cartons of Nellie's eggs state that, in contrast to deceptively-labeled "cage-free" eggs, Nellie's hens "can peck, perch, and play on plenty of green grass."

45.     To drive home this point, the email address on the carton, at which Defendants invite customers to contact them, is kindnesscrew@nelliesfreerange.com.

**A.      Consumers do not view and interpret these slogans in the abstract**

46.     Consumers do not view—and interpret—these slogans in the abstract. Rather, consumers view them alongside images of hens frolicking in lush, open fields:



**Carton Panel A**



**Carton Panel B**



**Carton Panel C**



**Carton Panel D**



**Carton Panel E**



**Carton Panel F**

47.     Plaintiffs reasonably interpreted these words and images—including the textual and visual references to concepts such as "love" and "kindness"—to mean that Defendants do not cause laying hens undue pain.  Specifically, Plaintiffs believed these words and images meant that Defendants let their hens engage in natural behaviors—stretching, roaming, foraging, and dust bathing—on small farms, with easy access to green grass and freedom from the over-crowding and stress found elsewhere.  Plaintiffs believed that any egg seller that professes to

- 20 -

"love" their hens would never engage in the behaviors described below, including the violent and systematic slaughter of male chicks, beak mutilation, over-crowding, deprivation of natural behaviors, deprivation of viable access to the outdoors, imposition of extreme stress, painful malnourishment and premature sale to commercial slaughter.

48.     Plaintiffs believed this because it is what Defendants firmly communicate to customers. Defendants intend consumers to rely on these words and images as specific claims about how Defendants treat their hens.  If consumers have any doubts, Defendants invite them to learn more on Nellie's website.

49.     Consumers taking Defendants up on their offer to investigate further on Nellie's website would encounter the **guarantee** that Defendants' farms are exactly as they appear to be on each carton of Nellie's eggs.

50.     A consumer visiting Nellie's website in the past year would find links to videos with the following text and imagery:

- A young boy holding a hen outside, with the text "A KINDER KIND OF EGG™ WATCH OUR CAGE-FREE HENS RUN";

- A young girl holding a hen outside, with the text "WE LOVE OUR HENS, YOU'LL LOVE OUR EGGS™ CHECK OUT OUR NEW VIDEO";

- A "Cage Free" egg carton, with the text "UNDERSTANDING EGGS"; and

- A young boy, pictured in black-and-white, on a bicycle with a hen in its basket, with the text "THE NELLIE'S STORY."

51.     The title of the first of these videos is "Certified Humane, Free Range Hens outside on green grass."  Jesse Laflamme, the "Chief Executive Farmer" for Defendants, narrates.  With wide shots, this video depicts open sprawling farms of green grass with hens

outside, scratching and dust bathing.  Laflamme discusses the hens' access to the outside where "they enjoy the sunshine and the green grass" and Defendants' "belie[f] that hens should be outside, they should be free range."  Laflamme further states that hens "just love being outside in the grass, they love scratching, they love dust bathing, they love being able to roost and socialize out in the sunshine.  It's where hens should be."  The video shows hens only in these expansive outdoor spaces:



52.     The title of the second video is "Hens are Friends."  It depicts, in both contemporary and vintage footage, small groups of hens outdoors frolicking with or eating from the hands of children.  The video also shows young children gathering eggs in what appears to be a small henhouse.  To drive home its message—"WE LOVE OUR HENS"—a boy stands amid a green landscape and small buildings, surrounded by playful hens:



53.     The title of the third video is "Understanding Eggs."  It discusses "what goes into making a good egg" and how to "know if an egg comes from a happy hen or even a healthy one."  It discusses the difference between specialized egg labels: "all natural farm fresh," "cage free," and "free range."  The narrator describes a "cage free" hen as "still liv[ing] inside a space much like a large overcrowded warehouse"—deeming it "still a pretty grim existence" because "she'll never get to see the outdoors or have the environment she needs to act like a normal hen." For comparison, the video includes an image of a cage free farm:



54.     Defendants then contrast this image with descriptions of their own hens, who are "happy" because they "get to live their lives like real hens.  With access to pasture every day in good weather, our hens can spread their wings, forage in the fields, or scratch at the dirt."  The video includes a series of images purportedly depicting its farms:











55.     The title of the fourth video is "Jesse & Nellie Deliver Eggs By Bicycle." Nellie's co-founder Carol Laflamme narrates.  She describes, over imagery of sprawling fields, Jesse Laflamme having a pet chicken at home named Nellie who would play in a sandpit, sit on his lap and sit in the basket of his bicycle while he rode around to sell eggs to neighboring families.

56.     Defendants repeat, and elaborate on, these messages elsewhere on Nellie's website.  Under a heading, "LIFE ON A FREE RANGE FARM," Defendants tell consumers: "Our happy hens are free to roam and strut throughout their wide open pasture.  They peck at bugs and flowers, cluck around in groups, and just live as free as a bird all day long."

57.     This section of Defendants' website is accompanied by multiple images showing hens in idyllic pastures, roaming at will:





58.     Under another heading, "OUR FREE RANGE HENS," Defendants tell consumers: "Nellie's Free Range Hens are among the happiest hens on earth.  They love spending their days in sunshine and laying nutritious eggs that simply taste better than factory-farmed eggs."

59.     A video slideshow that accompanies this claim shows a little girl running and playing with hens free to roam easily outdoors:



60.     Under another heading, "UNDERSTANDING FREE RANGE VS. CAGE-FREE," Defendants tell consumers: "Nellie's hens have the freedom to move about their barns and their adjoining pasture at will. Our hens live in a healthy, happy environment—just as it's meant to be!"

61.     An image that accompanies this section of Defendants' website shows hens streaming out of their barn into the outdoors:



62.     Under another heading, "WE TREAT OUR HENS LIKE FRIENDS," Defendants tell consumers: "This means that our family farmers treat all of our free range hens like they would treat any friend, with love and gratitude."

63.     An image that accompanies this claim shows a little girl hugging a hen, in front of a flock of hens roaming outdoors:



64.     In a section of their website that asks: "What is Free Range?" Defendants tell

consumers their "free range environment . . . **guarantees** that on every one of our small, free

range farms:

- Hens live in 'floor barns' (i.e. no cages or levels) and have plenty of space
  to perch and socialize.
- They have easy access to the outdoors with real grass to peck, play and
  dust bathe.
- They have access to antibiotic free feed and fresh water 24/7.
- And much more." (emphasis added)

65.     Above this page, a banner ad claims Defendants' hens have a "STRESS FREE

ENVIRONMENT":



66.     Nellie's website champions Defendants' conduct as the gold standard of egg production, stating "if there *was* a better way to raise them — we'd be doing it."

67.     In all, Defendants' website has a clear, uniform **guarantee** for consumers.  This **guarantee** is that consumers should understand the slogans, images and statements on each carton of Nellie's eggs both seriously and literally.

### III.   Contrary to Their Claims, Defendants Give Their Chickens Only Short, Cruel Lives in Cramped, Highly Stressful Environments that Often Provide No Viable Outdoor Access

68.     Defendants' work to convince consumers they uniquely provide chickens more "love" and "kindness" than the competition, or that they provide chickens loved, happy, healthy, and low-stress lives is deceptive.  Instead of space to stretch, flap their wings, forage, dust bathe and enjoy functional social interactions, Defendants provide hens cramped, stressful environments, lacking meaningful access to the outdoors or to sunlight. These hens have their beaks mutilated when they are one day old.  Defendants deprive them necessary vitamins and nutrients.  They lay an egg a day, every day, for most of their lives.  After Defendants' overworked, crowded and malnourished hens prematurely deplete themselves of calcium, Defendants sell them to slaughter.

69.     The male chicks born at hatcheries Defendants contract with fare no better.  They are violently killed shortly after birth.

## A.   Defendants Condone Killing Male Newborn Chickens

70.     The life cycle of the chickens kept by Defendants starts with death.  Defendants contract with hatcheries to breed chickens.  Once the chicks hatch, they are sorted by sex.  The female chicks are marked for life as laying hens and are transported to pullet houses when they are one day old.  They are warehoused at pullet houses until they can lay eggs.  The male chicks are systematically and gruesomely killed.

71.     By Defendants' admission, these hatcheries may use any one of the many methods condoned by the American Veterinary Medical Association (AVMA) to kill these male chicks.

72.     These methods include the most common method used to kill male chicks: Maceration.  Maceration entails running the male chicks, fully conscious, through a machine with rotating blades similar to a wood-chipper.  The AVMA condones maceration as one acceptable killing method both because it is "almost" instantaneous and because "[l]arge numbers of animals can be killed quickly."  The AVMA cautions that if chicks are not delivered to the macerator correctly, there can be a "backlog of chicks at the point of entry into the macerator."  This can cause "injury, suffocation, or avoidable distress to the chicks before maceration."

73.     Another AVMA-condoned killing method is exposing chicks to carbon dioxide ($CO_2$).  It can take minutes of exposure to kill day-old chicks exposed in batches.  Because immature chicks' respiratory systems are not fully developed, the AVMA warns that "high $CO_2$ concentrations, combined with extended exposure times" may need to be accompanied by a secondary killing method.  Death via $CO_2$ exposure may lead to prolonged suffering.

74.     Death via exposure to $CO_2$ is painful.  Before death, exposure to $CO_2$ can cause carbonic acid to form in the nose and eyes.  Carbonic acid is an irritant that is acutely painful and causes air hunger, a distressing condition in which an individual feels they are not getting enough air.  The AVMA acknowledges that, because of the convulsions induced by $CO_2$ exposure, this killing method can "be disconcerting for observers."

75.     Exposure to carbon monoxide, nitrogen, or argon—other condoned methods—can also induce distress and convulsions before death.  In chickens, these gases cause convulsive wing flapping.  Use of either nitrogen or argon to kill chickens requires exposure for more than three minutes.

76.     Plaintiffs believe that Defendants' use or condoning of these practices is deceptive in light of their claims—made prominently on each carton of Nellie's eggs—that, unlike other egg sellers, they uniquely provide chickens with more "love" and "kindness," including freedom from unnecessary pain and distress.

**B.     Defendants Require All Hens They Keep Have Their Beaks Mutilated**

77.     The surviving chicks all have their beaks "trimmed" at one-day old at what Defendants refer to as "our small family pullet farms." Beak "trimming" is a euphemism for cutting or searing off approximately one-quarter of a chicken's upper—or both upper and lower—beak.

78.      Chicken beaks are particularly complex and sensitive sensory organs.  The tips of chicken beaks contain clusters of highly sensitive mechanoreceptors.  These mechanoreceptors are capable of feeling acute pain.  Left fully intact, chickens use their beaks to engage in precise tactile behaviors.  In nature, chickens will spend more than 60 percent of their time engaging in instinctive foraging behaviors—pecking and scratching at potential food sources.

79.     Hot blades often used to sever beaks can damage nerves two to three millimeters away from the cut site due to the high temperature of the blade.  Any method can cause abnormal nerve growths to develop near the end of the nerve stump.  These abnormal growths exhibit similar spontaneous discharge patterns seen in human amputees experiencing phantom limb pain, and it is likely that chickens experience chronic pain as a result of beak amputations.

80.     Defendants state that "we recently began transitioning" to an infrared beak cutting method.  This method of beak cutting still generally requires hens be restrained by the head and suspended.

81.     Beak cutting—by any method—reduces sensory function due to removal of mechanoreceptors.  The mutilated beak mostly lacks physical sensation.  This deprives mutilated hens of the ability to experience a full range of instinctive foraging behaviors.  Hens that have had their beaks cut spend more time engaged in passive behaviors, such as resting and standing, instead of more natural, active behaviors.  Beak-cut hens also engage in more guarding behaviors associated with pain.

82.     Beak-cut hens suffer from a variety of other maladies.  Their ability to consume food is impaired.  This is both because beak-cut chickens have greater mechanical difficulty in feeding and because they likely feel increased pain and discomfort caused by tissue, nerve and sensory receptor damage.   In addition, studies have shown beak-cut chickens are further discomforted by being unable to effectively rid themselves of lice—likely because they are slower to respond and less effective at preening their feathers.

83.     Beak cutting is not a necessary evil. More humane flock management practices allow hens to be kept with intact beaks.  While the ostensible purpose of beak cutting is to prevent severe feather pecking, self-mutilation and cannibalism among farmed hens, beak cutting

is only a requirement in farms that house hens in dysfunctional social groupings and environments lacking crucial resources. Farms that do not subject hens to extreme density and stress; manage pollutants; include more sheltering areas, warmer lighting, and environmental enhancements such as pecking blocks and appropriate perches; and adequately stimulate feeding and foraging behavior—including via adequate nutrition and suitable litter—do not need to cut hens' beaks.

84.   Plaintiffs believe that Defendants' use or condoning of these practices is deceptive in light of their claims—made prominently on each carton of Nellie's eggs—that, unlike other egg sellers, they uniquely provide laying hens with more "love" and "kindness," including freedom from unnecessary pain and distress.

### C.   Hens Kept by Defendants Are Crammed Tightly Together in Sheds

85.   Once they can lay eggs, these hens are sent to the contract farms Defendants brag about on each carton of Nellie's eggs.

86.   At these farms, approximately 20,000 hens are crammed together in a single shed. They are limited to only 1.2 square feet of floor space each, if that. Visitors to these sheds have difficulty walking without stepping on hens. This arrangement is far from the images Defendants sell the public on their egg cartons:











87.     Confinement to such restricted space actively harms hens.  It prevents hens from performing many natural behaviors, such as extending their wings, stretching their necks to forage, moving about, dust bathing, or properly roosting and resting.  The ability to move through a variety of natural postures is important for overall bone and muscle strength, and reduces the risk of other issues such as painful foot lesions and deformations.  Inability to perform these activities causes distress, trauma and illness.

88.     Forcing so many hens together also causes psychological harm, which in turn leads to additional physical harm.  Hens cannot maintain a natural pecking order at this population density.  Instead, many stressed hens will violently enforce ad-hoc social dynamics to secure access to the limited space and resources available.  Other hens will suffer from bullying and from being pecked.  Defendants exacerbate these conditions by not offering sufficient hiding places that would permit hens to efficiently escape aggression.

89.     Many of the hens kept by Defendants suffer feather loss.  Missing feathers are often caused by injuries inflicted either by hens who are more dominant or by self-mutilation, in which hens will pluck their own feathers due to stress or inadequate diet.

90.     Hens whose movements are so severely restricted in this manner are likely to develop osteoporosis, bone fractures, painful foot lesions and other deformities.  Relative inactivity and inadequate nutrition cause and exacerbate these conditions.

91.     Confining so many hens together frequently causes the hens to engage in excessive vocalization.  As a result, the noise level is often cacophonous.  This is another harm to the hens.  Chickens are highly sensitive to sound.  Unlike humans, they can detect both low-and-high frequency sounds at a wide range of pressure levels.  Excessively noisy environments cause

chronic stress to hens, which can lead to overproduction of adrenal hormones and suppression of the immune system.

92.    Plaintiffs believe that Defendants' use or condoning of these practices is deceptive in light of their claims—made prominently on each carton of Nellie's eggs—that, unlike other egg sellers, they uniquely provide laying hens with more "love" and "kindness," including freedom from unnecessary pain and distress, adequate space, and freedom to roam.

### D.    Many Hens Defendants Keep Never See the Outdoors

93.    Many of the hens kept by Defendants never access the outdoor space featured so prominently on cartons of Nellie's eggs.  At some of Defendants' farms, hens can only get outside through small hatches cut at intervals along the sides of the shed:









94.     These hatches are closed all winter and during inclement weather.  Even in pleasant weather, these hatches are closed at night and not opened until 1:00 p.m. the next day.

95.     These hatches are window-dressing.  Because Defendants cram so many hens inside one shed and prevent the hens from engaging in functional social dynamics, hens that are far away from these hatches cannot access them without pushing past many thousands of other frantic hens, who may be more socially dominant.

96.     Many of these hens will never access the hatches and so will never see or feel grass, soil, fresh air, or sunlight.  For these hens, the distance and crowd of hens it would be necessary to push through to get to the hatches acts as a permanent deterrent.

97.     The overcrowding Defendants force on these hens exacerbates the problem. Because the hens learn to aggressively protect their tiny spaces, any hen attempting to reach these hatches risks attacks from other hens.

98.     Plaintiffs believe that Defendants' use or condoning of these practices is deceptive in light of their claims—made prominently on each carton of Nellie's eggs—that, unlike other egg sellers, they uniquely provide laying hens with more "love" and "kindness," including meaningful freedom to roam and access to the outdoors.

### E.     Defendants Kill Hens After Their Value Quickly Diminishes

99.     Hens kept by Defendants lay an egg a day, every day, starting when they are 17 to 18 weeks old. This lasts only 13 months.  After 13 months, this high rate of egg laying has depleted the hens of calcium and worn out their reproductive systems.  When hens lack sufficient calcium to continue egg laying, they will drain calcium from their own bones.  This condition—known as hypocalcemia—causes osteoporosis, bone fractures, weakness, paralysis, and sudden death.

100.     Another symptom of hypocalcemia is that hens lay fewer eggs.  The eggs they do lay become more thin, fragile, and prone to breaking.

101.     Calcium depletion—hypocalcemia—after 13 months is not a natural part of a hen's life cycle.  It is a condition caused by overproduction, dietary vitamin and mineral imbalances, and lack of access to direct sunlight needed to activate vitamin D and to aid in calcium absorption.  Stress exacerbates hypocalcemia.

102.     Hypocalcemia marks the beginning of the end for these hens.  Broken eggs, in the words of a Nellie's supplier, "leech into the profits."  Consumers may have assumed, based on Defendants' advertising, that "love" would mean feeding and housing retired hens, or adopting the hens out to sanctuaries.  Defendants reject these options.

103.     Defendants reject these options because "it would prevent us from achieving our broader aim of building a sustainable business" (what Defendants state on their website) and

because "feed is very expensive" (what one of Defendants' suppliers told a visitor to one of their farms).   Instead, Defendants choose to sell their hens for use by slaughterhouses and live markets.

104.    In an effort to disclaim any responsibility for conditions they know conflict with their product packaging, Defendants state that, once they sell their hens to a slaughterhouse or a live market, "the hens belong to that company."

105.    At live markets, hens often live in the conditions Defendants tell consumers they deplore.  It is standard practice for live markets to pack hens into crates and cages for extended periods, deprive hens of food or water and leave hens immersed in filth.  After a live market customer picks a hen, live market staff will likely weigh her upside down, with her head hanging down, in a position that is distressing and fear-inducing because it prevents her from breathing properly.

106.    Killing methods used by slaughterhouses and live markets, some of which are described above, include gassing (using agents such as $CO_2$, carbon monoxide, nitrogen, and argon), cervical dislocation (manually severing the spinal cord), electrocution, decapitation (chopping off a hen's head) and exsanguination (throat slashing to drain a hen's blood).

107.    Decapitation requires handling and restraint that causes hens extreme distress.  It also requires qualified personnel and expert maintenance of equipment in order to avoid excessive pain.   Qualified personnel and perfect maintenance of equipment are not always present.

108.    Electrical activity in a hen's brain continues after her head is chopped off, indicating that death is likely not instantaneous.

109.   Exsanguination, performed "properly," requires a hen first be completely stunned or unconscious before her throat is slashed.   Methods of stunning hens or rendering hens unconscious are imperfect, and often lead to hens having their throats slashed while still alive. This causes extreme anxiety, pain and distress.   Methods of stunning hens or rendering hens unconscious also cause distress or pain themselves.   For example, electrical water bath stunning requires forcing a live, conscious hen upside down by her legs into metal shackles.   Poor shackle design can cause significant pain—chickens have pain receptors in their legs—and lead to painful pre-stun electric shocks.

110.   Another common method of exsanguination involves use of killing cones.   Killing cones are typically trapezoid-shaped metal funnels into which a hen is shoved face down before having her throat slashed.   An inexpert or flawed slash will prolong the time until death and cause her more pain and distress.   She will kick and jerk while her blood is draining.   If not properly secured, spasms can flip her out of the cone onto the floor to thrash about before she fully bleeds out.

111.   Another common method, electrocution, often involves two steps.   The first step requires an electrical current to be passed through a hen's head to induce unconsciousness.   A second current is then used to induce cardiac arrest.   If electrodes are placed incorrectly—or if the first step is neglected—she may be fully conscious during electrocution.

112.   Another common method, cervical dislocation, requires grasping a hen's legs or wings and stretching her head by pulling on her head while rotating her skull, snapping her spinal cord.   Cervical dislocation does not always cause immediate unconsciousness, and when performed improperly will cause pain, paralysis, and prolonged time to death.   Proper execution of cervical dislocation requires mastery of highly technical skills.

113.    The AVMA does not approve use of any of these killing methods for companion animals—i.e., animals for whom the relationships between owners and animals merit consideration.

114.    It is possible that the live markets at which Defendants' hens end up kill these hens via even more prolonged, distressing and painful methods than those described above. Manual blunt force trauma, gunshots, captive bolts, drowning and smothering are other methods used to kill chickens.

115.    Some live markets also sell hens, still alive and conscious, to individuals who will kill them using whatever method that individual may choose.

116.    The above scenarios represent situations in which everything goes "right" for hens sold by Defendants.  Hens sold to slaughterhouses and live markets, as these hens are, have also been known to:

- Suffocate beneath other chickens in over-crowded conditions;

- Drown or be scalded alive after being forced into scalding tanks while still conscious;

- Suffer and die from dehydration or exposure to heat or freezing temperatures while being transported; or

- Suffer and die from sadistic abuse by slaughterhouse or live market staff.

117.    Plaintiffs believe that Defendants' enabling, use or condoning of these practices is deceptive in light of their claims—made prominently on each carton of Nellie's eggs—that, unlike other egg sellers, they uniquely provide laying hens with more "love" and "kindness," including freedom from unnecessary pain and distress.

118.     After Defendants sell a flock of 20,000 hens, farm staff sweep, power wash and sanitize the shed.  At a pullet house, tens of thousands of newborn hens have had their beaks newly cut.  Their brothers are fed to a macerator.  Defendants are ready for the next 20,000 hens to move in.

## CLASS ACTION ALLEGATIONS

119.     Plaintiffs seek redress in their individual capacities and on behalf of a Class consisting of similarly situated consumers.  Pursuant to Fed. R. Civ. P. 23(a) and (b)(2) or (b)(3), Plaintiffs seek Class certification of a Class defined as follows:

**All individuals in the U.S. who purchased Nellie's eggs in the last three years.**

120.     Plaintiffs reserve the right to amend or modify the Class definition with greater specificity or subclass divisions after discovery.

121.     Excluded from the Class are: (i) any judge presiding over this action and their family members; (ii) Nellie's, its subsidiaries, successors, or any entity in which Nellie's or Pete and Gerry's or its parent companies may have a controlling interest, Nellie's current or former employees, officers, or directors; (iii) persons that properly exclude themselves from the Class; and (iv) the legal representatives, successors, or assignees of any properly excluded persons.

122.     Numerosity. The potential Class members as defined are so numerous and diversely located throughout the U.S. that joinder of all Class members is impracticable.  While the exact number of Class members is unknown because such information is in the exclusive control of Nellie's and retailers that sell its eggs, upon information and belief, the Class is greater than 100 individuals.

123.    Commonality.  There are questions of law and fact common to Plaintiffs and the Class that predominate over any questions affecting only individual Class members.   These common questions of law and fact include, *inter alia*, whether:

- Nellie's violated New York's General Business Law § 349;

- Nellie's violated New York's General Business Law § 350;

- Nellie's violated California's Unfair Competition Law - California Bus. & Prof. Code § 17200, *et seq.*;

- Nellie's violated California's False Advertising Law - California Bus. & Prof. Code § 17500, *et seq.*;

- Nellie's violated Maryland's Unfair or Deceptive Trade Practices Law, Md. Code Ann., Com. Law § 13-301, *et seq.*;

- Nellie's violated North Carolina's Unfair and Deceptive Trade Practices Law, N.C. Gen. Stat. § 75-1.1, *et seq.*;

- Nellie's violated Massachusetts's Consumer Protection Act, Mass. Gen. Laws Ann. ch. 93A, § 1, *et seq.*;

- Nellie's violated Georgia's Fair Business Practices Act , Ga. Code Ann. § 10-1-390, *et seq;*

- Nellie's engaged in, and continues to engage in, unlawful, fraudulent, and unfair practices that are substantially likely to mislead the public, and therefore members of the Class;

- Nellie's has engaged in and continues to engage in unlawful, fraudulent, and unfair practices, including by representing to the

public, and Class members, that it provides eggs from laying hens
that are raised humanely, with adequate outdoor access and space;

- Nellie's fraudulently and unfairly misrepresents to Class members
that Nellie's had the ability to and would in fact ensure that it
provides eggs from hens that are raised humanely, with adequate
outdoor access and space;

- Nellie's fraudulent and unfair misrepresentations to Class members
allowed Nellie's to cover up its horrific and cruel treatment of
laying hens such that Nellie's has committed fraud against
consumers and the public;

- Nellie's deceptive conduct resulted in profits and pecuniary gain
received from consumers, including Class members;

- Class members are entitled to damages under New York,
California, Georgia, Maryland, Massachusetts, and North Carolina
state consumer laws;

- Declaratory and injunctive relief is available in this action;

- Plaintiffs and Class members are entitled to injunctive relief,
attorneys' fees, and costs; and

- Class members are entitled to equitable or any other forms of
relief.

124.   Typicality.  Plaintiffs' claims are typical of the claims of the Class.  Plaintiffs and
Class members were exposed and subjected to Nellie's uniform practices and policies
surrounding its representations to the public it provides eggs from hens that are raised humanely,

with adequate outdoor access and space, that has resulted in, and will continue to cause, irreparable harm but for immediate action by the Court.

125.     Adequacy of Representation. Plaintiffs will fairly and adequately represent and protect the interests of the Class members. Plaintiffs' counsels are competent and experienced in litigating class actions.

126.     Superiority of Class Action. A class action is superior to other available methods for the fair and efficient adjudication of this controversy because joinder of all of the Class members is impracticable. Furthermore, the adjudication of this controversy through a class action will avoid the possibility of inconsistent and potentially conflicting adjudication of the asserted claims. There will be no difficulty in the management of this action as a class action.

127.     Injunctive and Declaratory Relief.  Nellie's practices are uniform as to all Class members. Nellie's has acted or refused to act on grounds that apply generally to the Class, so that final injunctive or declaratory relief is appropriate with respect to the Class as a whole.

## CAUSES OF ACTION

### First Cause of Action: Violations of the General Business Law § 349
**(On Behalf of Plaintiffs Michelle Lugones, Tricia Rizzi,
Marcus Siezing, Claudia Vassallo, Anne Flournoy and the Class)**

128.     Plaintiffs, on behalf of themselves and the Class, incorporate by reference all allegations of the Complaint.

129.     Defendants' acts and practices are not unique to the parties and have a broader impact on the public.

130.     Defendants' portrayal of chickens on cartons of Nellie's eggs as leading loved, happy, healthy and low-stress lives on small farms in which they can freely roam was, and continues to be, false and misleading.  The truth is that Defendants offer many chickens only

short and miserable lives during which—if they are not violently killed shortly after birth—they are mutilated, live in severely over-crowded conditions, lack sufficient space to engage in instinctive and vital behaviors, lack viable access to the outdoors, are constantly under extreme stress, and are painfully malnourished before being sold off to painful and distressing deaths.

131.    At all times during which Defendants made the above-referenced representations to Plaintiffs, and to the public, Defendants knew, or were willful in not knowing, that they were false and misleading in the manner referenced above.

132.    The above-referenced representations were material facts that Plaintiffs relied on, paying premium prices for Nellie's eggs that Defendants would not have been able to charge absent the above-referenced representations. Plaintiffs did not receive all that they bargained for.

133.    As a result, Plaintiffs have suffered damages in an amount to be determined at trial.

134.    Plaintiffs further seek to enjoin such unlawful and deceptive acts and practices described above.   Unless the unlawful actions of Defendants are enjoined, Defendants will continue to deceptively portray their chickens as leading loved, happy, healthy and low-stress lives on small farms in which they can freely roam.

### Second Cause of Action: Violations of the General Business Law § 350
**(On Behalf of Plaintiffs Michelle Lugones, Tricia Rizzi,
Marcus Siezing, Claudia Vassallo, Anne Flournoy and the Class)**

135.    Plaintiffs, on behalf of themselves and the Class, incorporate by reference all allegations of the Complaint.

136.    Defendants' acts and practices are not unique to the parties and have a broader impact on the public.

137.    Defendants' portrayal of chickens on cartons of Nellie's eggs as leading loved, happy, healthy and low-stress lives on small farms in which they can freely roam was, and continues to be, false and misleading.  The truth is that Defendants offer many chickens only short and miserable lives during which—if they are not violently killed shortly after birth—they are mutilated, live in severely over-crowded conditions, lack sufficient space to engage in instinctive and vital behaviors, lack viable access to the outdoors, are constantly under extreme stress, and are painfully malnourished before being sold off to painful and distressing deaths.

138.    At all times during which Defendants made the above-referenced representations to Plaintiffs, and to the public, Defendants knew, or were willful in not knowing, that they were false and misleading in the manner referenced above.

139.    The above-referenced representations were material facts that Plaintiffs relied on, paying premium prices for Nellie's eggs that Defendants would not have been able to charge absent the above-referenced representations.  Plaintiffs did not receive all that they bargained for.

140.    As a result, Plaintiffs have suffered damages in an amount to be determined at trial.

141.    Plaintiffs further seek to enjoin such unlawful and deceptive acts and practices described above.  Unless the unlawful actions of Defendants are enjoined, Defendants will continue to deceptively portray their chickens as leading loved, happy, healthy, and low-stress lives on small farms in which they can freely roam.

**Third Cause of Action: Violations of California's Unfair Competition Law -- California Bus. & Prof. Code § 17200, *et seq.***
**(On Behalf of Plaintiff Denise Alvarado and the Class)**

142.    Plaintiffs, on behalf of themselves and the Class, incorporate by reference all allegations of the Complaint.

143.    Defendants' acts and practices are not unique to the parties and are likely to deceive a significant portion of reasonable consumers.

144.    Defendants' portrayal of chickens on cartons of Nellie's eggs as leading loved, happy, healthy and low-stress lives on small farms in which they can freely roam was, and continues to be, unlawful, unfair and fraudulent.  These portrayals are unlawful, unfair, and fraudulent because Defendants offer many chickens only short and miserable lives during which—if they are not violently killed shortly after birth—they are mutilated, live in severely over-crowded conditions, lack sufficient space to engage in instinctive and vital behaviors, lack viable access to the outdoors, are constantly under extreme stress and are painfully malnourished before being sold off to painful and distressing deaths.

145.    Defendants' conduct, described above, is unlawful because Defendants engaged in unfair, unlawful and fraudulent business practices in violation of California's Unfair Competition Law, Cal. Bus. & Prof. Code § 17200, *et seq*.

146.    Defendants' conduct, described above, is unfair because it offends established public policies against false and misleading advertising and is immoral, unethical, oppressive, unscrupulous and substantially injurious to Plaintiffs and California consumers.  The harms caused by Defendants' conduct outweigh any benefits associated with them.

147.    Defendants' conduct, described above, is fraudulent because it was and is likely to deceive a significant portion of reasonable consumers, including Class members.

148.    At all times during which Defendants made the above-referenced representations to Plaintiffs, and to the public, Defendants knew, or were willful in not knowing, that they were false and misleading in the manner referenced above.

149.     The above-referenced representations were material facts that Plaintiffs relied on, paying premium prices for Nellie's eggs that Defendants would not have been able to charge absent the above-referenced representations.  Plaintiffs did not receive all that they bargained for.

150.     As a direct and proximate result of Defendants' conduct, as set forth herein, Defendants have received ill-gotten gains and/or profits, including, but not limited to money. Therefore, Defendants are and were unjustly enriched.

151.     Plaintiffs further seek to enjoin such unlawful and deceptive acts and practices described above.  Unless the unlawful actions of Defendants are enjoined, Defendants will continue to deceptively portray their chickens as leading loved, happy, healthy and low-stress lives on small farms in which they can freely roam.

152.     Plaintiffs are entitled to an award of reasonable attorneys' fees and costs under California Code of Civil Procedure 1021.5 for the benefit conferred upon the general public of the State of California by any injunctive or other relief entered herein.

**Fourth Cause of Action: Violations of California's False Advertising Law -- California Bus. & Prof. Code § 17500,** *et seq.*
**(On Behalf of Plaintiff Denise Alvarado and the Class)**

153.     Plaintiffs, on behalf of themselves and the Class, incorporate by reference all allegations of the Complaint.

154.     Defendants' acts and practices are not unique to the parties and are likely to deceive a significant portion of reasonable consumers.

155.     Defendants' portrayal of chickens on cartons of Nellie's eggs as leading loved, happy, healthy and low-stress lives on small farms in which they can freely roam was, and continues to be, false and misleading.  The truth is that Defendants offer many chickens only short and miserable lives during which—if they are not violently killed shortly after birth—they

are mutilated, live in severely over-crowded conditions, lack sufficient space to engage in instinctive and vital behaviors, lack viable access to the outdoors, are constantly under extreme stress, and are painfully malnourished before being sold off to painful and distressing deaths.

156.   At all times during which Defendants made the above-referenced representations to Plaintiffs, and to the public, Defendants knew, or were willful in not knowing, that they were false and misleading in the manner referenced above.  Defendants' conduct, described above, is unlawful because it violates the California False Advertising Law, California Business & Professions Code § 17500, *et seq.*

157.   The above-referenced representations were material facts that Plaintiffs relied on, paying premium prices for Nellie's eggs that Defendants would not have been able to charge absent the above-referenced representations.  Plaintiffs did not receive all that they bargained for.

158.   As a result, Plaintiffs have suffered damages in an amount to be determined at trial.

159.   Plaintiffs further seek to enjoin such unlawful and deceptive acts and practices described above.   Unless the unlawful actions of Defendants are enjoined, Defendants will continue to deceptively portray their chickens as leading loved, happy, healthy and low-stress lives on small farms in which they can freely roam.

160.   Plaintiffs are entitled to an award of reasonable attorneys' fees and costs under California Code of Civil Procedure 1021.5 for the benefit conferred upon the general public of the State of California by any injunctive or other relief entered herein.

**Fifth Cause of Action- Violations of Maryland's Unfair or Deceptive Trade Practices Law,
Md. Code Ann., Com. Law § 13-301**
**(On Behalf of Plaintiff Karine Sewell and the Class)**

161.    Plaintiffs, on behalf of themselves and the Class, incorporate by reference all allegations of the Complaint.

162.    Defendants' visual portrayal of chickens on cartons of Nellie's eggs as leading loved, happy, healthy, and low-stress lives on small farms in which they can freely roam was, and continues to be, false and deceptive.  The truth is that Defendants offer many chickens only short and miserable lives during which—if they are not violently killed shortly after birth—they are mutilated, live in severely over-crowded conditions, lack sufficient space to engage in instinctive and vital behaviors, lack viable access to the outdoors, are constantly under extreme stress, and are painfully malnourished before being sold off to painful and distressing deaths.

163.    At all times during which Defendants made the above-referenced representations to Plaintiffs, and to the public, Defendants knew, or were willful in not knowing, that they were false and misleading in the manner referenced above.  Defendants' conduct, described above, is unlawful because it violates Maryland's Unfair or Deceptive Trade Practices Law, Md. Code Ann., Com. Law § 13-301, *et seq.*

164.    The above-referenced representations were material facts that Plaintiffs relied on, paying premium prices for Nellie's eggs that Defendants would not have been able to charge absent the above-referenced representations.  Plaintiffs did not receive all that they bargained for.

165.    As a result, Plaintiffs have suffered damages in an amount to be determined at trial.

166.    Plaintiffs further seek to enjoin such unlawful and deceptive acts and practices described above.  Unless the unlawful actions of Defendants are enjoined, Defendants will

continue to deceptively portray their chickens as leading loved, happy, healthy and low-stress lives on small farms in which they can freely roam.

167.    Plaintiffs are entitled to an award of compensatory damages and reasonable attorneys' fees and costs under Md. Code Comm. Law § 13-408 for the benefit conferred upon the general public of the State of Maryland by any injunctive or other relief entered herein.

**Sixth Cause of Action: Violations of North Carolina's Unfair & Deceptive Trade Practices Law, N.C. Gen. Stat. § 75-1.1**
**(On Behalf of Plaintiff Sonja Romano and the Class)**

168.    Plaintiffs, on behalf of themselves and the Class, incorporate by reference all allegations of the Complaint.

169.    Defendants' portrayal of chickens on cartons of Nellie's eggs as leading loved, happy, healthy and low-stress lives on small farms in which they can freely roam was, and continues to be, false and deceptive.  The truth is that Defendants offer many chickens only short and miserable lives during which—if they are not violently killed shortly after birth—they are mutilated, live in severely over-crowded conditions, lack sufficient space to engage in instinctive and vital behaviors, lack viable access to the outdoors, are constantly under extreme stress, and are painfully malnourished before being sold off to painful and distressing deaths.

170.    At all times during which Defendants made the above-referenced representations to Plaintiffs, and to the public, Defendants knew, or were willful in not knowing, that they were false and misleading in the manner referenced above.  Defendants' conduct, described above, is unlawful because it violates North Carolina's Unfair & Deceptive Trade Practices Law, N.C. Gen. Stat. § 75-1.1, *et seq.*

171.    The above-referenced representations were material facts that Plaintiffs relied on, paying premium prices for Nellie's eggs that Defendants would not have been able to charge absent the above-referenced representations.  Plaintiffs did not receive all that they bargained for.

172.    As a result, Plaintiffs have suffered damages in an amount to be determined at trial.

173.    Plaintiffs further seek to enjoin such unlawful and deceptive acts and practices described above. Unless the unlawful actions of Defendants are enjoined, Defendants will continue to deceptively portray their chickens as leading loved, happy, healthy and low-stress lives on small farms in which they can freely roam.

174.    Plaintiffs are entitled to an award of punitive and compensatory damages and reasonable attorneys' fees and costs under N.C. Gen. Stat. § 75-16.1 for the benefit conferred upon the general public of the State of North Carolina by any injunctive or other relief entered herein.

**Seventh Cause of Action: Violations of Massachusetts's Consumer Protection Act, Mass. Gen. Laws Ann. ch. 93A, § 1, *et seq.***
**(On Behalf of Plaintiff Minoee Modi and the Class)**

175.    Plaintiffs, on behalf of themselves and the Class, incorporate by reference all allegations of the Complaint.

176.    Defendants' portrayal of chickens on cartons of Nellie's eggs as leading loved, happy, healthy and low-stress lives on small farms in which they can freely roam was, and continues to be, false and deceptive.  The truth is that Defendants offer many chickens only short and miserable lives during which—if they are not violently killed shortly after birth—they are mutilated, live in severely over-crowded conditions, lack sufficient space to engage in instinctive

and vital behaviors, lack viable access to the outdoors, are constantly under extreme stress and are painfully malnourished before being sold off to painful and distressing deaths.

177.   At all times during which Defendants made the above-referenced representations to Plaintiffs, and to the public, Defendants knew, or were willful in not knowing, that they were false and misleading in the manner referenced above.  Defendants' conduct, described above, is unlawful because it violates Massachusetts's Consumer Protection Act, Mass. Gen. Laws Ann. ch. 93A, § 1, *et seq.*

178.   The above-referenced representations were material facts that Plaintiffs relied on, paying premium prices for Nellie's eggs that Defendants would not have been able to charge absent the above-referenced representations.  Plaintiffs did not receive all that they bargained for.

179.   As a result, Plaintiffs have suffered damages in an amount to be determined at trial.

180.   Plaintiffs further seek to enjoin such unlawful and deceptive acts and practices described above.   Unless the unlawful actions of Defendants are enjoined, Defendants will continue to deceptively portray their chickens as leading loved, happy, healthy and low-stress lives on small farms in which they can freely roam.

181.   Plaintiffs are entitled to an award of punitive and compensatory damages and reasonable attorneys' fees and costs under Mass. Gen. Laws Ann. ch. 93A, § 1, *et seq.* for the benefit conferred upon the general public of the State of Massachusetts by any injunctive or other relief entered herein.

**Eighth Cause of Action: Violations of Georgia's Fair Business Practices Act , Ga.
Code Ann. § 10-1-390, *et seq.*
(On Behalf of Plaintiff Isabelle Gray and the Class)**

182.    Plaintiffs, on behalf of themselves and the Class, incorporate by reference all allegations of the Complaint.

183.    Defendants' portrayal of chickens on cartons of Nellie's eggs as leading loved, happy, healthy and low-stress lives on small farms in which they can freely roam was, and continues to be, false and deceptive.  The truth is that Defendants offer many chickens only short and miserable lives during which—if they are not violently killed shortly after birth—they are mutilated, live in severely over-crowded conditions, lack sufficient space to engage in instinctive and vital behaviors, lack viable access to the outdoors, are constantly under extreme stress and are painfully malnourished before being sold off to painful and distressing deaths.

184.    At all times during which Defendants made the above-referenced representations to Plaintiffs, and to the public, Defendants knew, or were willful in not knowing, that they were false and misleading in the manner referenced above.  Defendants' conduct, described above, is unlawful because it violates Georgia's Fair Business Practices Act , Ga. Code Ann. § 10-1-390, *et seq.*

185.    The above-referenced representations were material facts that Plaintiffs relied on, paying premium prices for Nellie's eggs that Defendants would not have been able to charge absent the above-referenced representations.  Plaintiffs did not receive all that they bargained for.

186.    As a result, Plaintiffs have suffered damages in an amount to be determined at trial.

187.    Plaintiffs further seek to enjoin such unlawful and deceptive acts and practices described above.  Unless the unlawful actions of Defendants are enjoined, Defendants will

continue to deceptively portray their chickens as leading loved, happy, healthy and low-stress lives on small farms in which they can freely roam.

188.    Plaintiffs are entitled to an award of punitive and compensatory damages and reasonable attorneys' fees and costs under Ga. Code Ann. § 10-1-390, *et seq.* for the benefit conferred upon the general public of the State of Georgia by any injunctive or other relief entered herein.

## Ninth Cause of Action: Fraud
### (On Behalf of the Class)

189.    Plaintiffs, on behalf of themselves and the Class, incorporate by reference all allegations of the Complaint.

190.    Defendants' portrayal of chickens on cartons of Nellie's eggs as leading loved, happy, healthy and low-stress lives on small farms in which they can freely roam was, and continues to be, false and misleading.  The truth is that Defendants offer many chickens only short and miserable lives during which—if they are not violently killed shortly after birth—they are mutilated, live in severely over-crowded conditions, lack sufficient space to engage in instinctive and vital behaviors, lack viable access to the outdoors, are constantly under extreme stress, and are painfully malnourished before being sold off to painful and distressing deaths.

191.    At all times during which Defendants made the above-referenced representations to Plaintiffs, and to the public, Defendants knew, or were reckless or willful in not knowing, that they were false and misleading in the manner referenced above.

192.    Despite this knowledge, Defendants persisted in their false portrayals on cartons of Nellie's eggs because these portrayals permit them to sell Nellie's eggs to caring consumers, and to sell them for more than they would otherwise, maximizing sales and profits at the expense of duped consumers, including Plaintiffs.

193.    The above-referenced representations were material facts that Plaintiffs relied on, paying premium prices for Nellie's eggs that Defendants would not have been able to charge absent the above-referenced representations.  Plaintiffs did not receive all that they bargained for.

194.    As a result, Plaintiffs have suffered damages in an amount to be determined at trial.

195.    Defendants are additionally liable for punitive or exemplary damages for their reckless, wanton, and willful disregard for Plaintiffs'—and other consumers'—right not to be misled in making humane purchasing decisions.  Defendants' conduct in this regard is so gross and outrageous as to evidence a high degree of moral turpitude and demonstrate such a contempt for consumers, including Plaintiffs, as to imply criminal indifference to civil obligations. Defendants' conduct is directed toward the public generally, and warrants the imposition of punitive and exemplary damages against Defendants.

### Tenth Cause of Action: Fraudulent Misrepresentation
### (On Behalf of the Class)

196.    Plaintiffs, on behalf of themselves and the Class, incorporate by reference all allegations of the Complaint.

197.    Defendants' portrayal of chickens on cartons of Nellie's eggs as leading loved, happy, healthy and low-stress lives on small farms in which they can freely roam was, and continues to be, false and misleading.  The truth is that Defendants offer many chickens only short and miserable lives during which—if they are not violently killed shortly after birth—they are mutilated, live in severely over-crowded conditions, lack sufficient space to engage in instinctive and vital behaviors, lack viable access to the outdoors, are constantly under extreme stress, and are painfully malnourished before being sold off to painful and distressing deaths.

198.    At all times during which Defendants made the above-referenced representations to Plaintiffs, and to the public, Defendants knew, or were reckless or willful in not knowing, that they were false and misleading in the manner referenced above.

199.    Despite this knowledge, Defendants persisted in their false portrayals on cartons of Nellie's eggs because these portrayals permit them to sell Nellie's eggs to caring consumers, and sell them for more than they would otherwise, maximizing sales and profit at the expense of duped consumers, including Plaintiffs.

200.    The above-referenced representations were material facts that Plaintiffs relied on, paying premium prices for Nellie's eggs that Defendants would not have been able to charge absent the above-referenced representations.  Plaintiffs did not receive all that they bargained for.

201.    As a result, Plaintiffs have suffered damages in an amount to be determined at trial.

202.    Defendants are additionally liable for punitive or exemplary damages for their reckless, wanton and willful disregard for Plaintiffs'—and other consumers'—right not to be misled in making humane purchasing decisions.  Defendants' conduct in this regard is so gross and outrageous as to evidence a high degree of moral turpitude and to demonstrate such a contempt for consumers, including Plaintiffs, as to imply criminal indifference to civil obligations.  Defendants' conduct is directed toward the public generally, and warrants the imposition of punitive and exemplary damages against Defendants.

### Eleventh Cause of Action: Breach of Express Warranty
#### (On Behalf of the Class)

203.    Plaintiffs, on behalf of themselves and the Class, incorporate by reference all allegations of the Complaint.

204.    Cartons of Nellie's eggs contain affirmations, via the words and images referenced above, that Defendants provide chickens loved, happy, healthy and low-stress lives on small farms in which they can freely roam.

205.    These affirmations were and are false.  The truth is that Defendants offer many chickens only short and miserable lives during which—if they are not violently killed shortly after birth—they are mutilated, live in severely over-crowded conditions, lack sufficient space to engage in instinctive and vital behaviors, lack viable access to the outdoors, are constantly under extreme stress, and are painfully malnourished before being sold off to painful and distressing deaths.

206.    The above-referenced affirmations were material facts that Plaintiffs relied on, paying premium prices for Nellie's eggs that Defendants would not have been able to charge absent the above-referenced representations.  Plaintiffs did not receive all that they bargained for.

207.    As a result, Plaintiffs have suffered damages in an amount to be determined at trial.

208.    Defendants are additionally liable for punitive or exemplary damages for their reckless, wanton and willful disregard for Plaintiffs'—and other consumers'—right not to be misled in making humane purchasing decisions.  Defendants' conduct in this regard is so gross and outrageous as to evidence a high degree of moral turpitude and to demonstrate such a contempt for consumers, including Plaintiffs, as to imply criminal indifference to civil obligations.  Defendants' conduct is directed toward the public generally, and warrants the imposition of punitive and exemplary damages against Defendants.

## JURY DEMAND AND PRAYER FOR RELIEF

Plaintiffs demand a jury trial on all issues.

Plaintiffs pray for relief as follows:

1.      Enter a declaration that Defendants have committed the violations of law alleged herein;

2.      Enter an injunction and order permanently restraining Defendants from engaging in such unlawful conduct;

3.      Enter a permanent injunction directing Defendants cease selling Nellie's eggs using product packaging that (i) includes the following terms and variations thereof: love, kindness, better lives, green grass or freedom for hens to roam where they please; (ii) includes images of hens indoors with more than 1.2 square feet of floor space per hen; and (iii) includes images of hens outdoors;

4.      Declare this action to be maintainable as a class action pursuant to Fed. R. Civ. P. 23, and designate Plaintiffs as representatives of their Class, and their counsel of record as Class counsel.

5.      Award compensatory damages as requested herein;

6.      Award punitive and exemplary damages as requested herein, in an amount sufficient to punish Defendants and deter others from similar wrongdoing;

7.      Enter judgment for interest at the legal rate on the foregoing sums;

8.      Enter judgment for costs and attorneys' fees, including litigation expenses reasonably incurred in the prosecution of the action; and

9.      Award any and all other general and equitable relief as this Court may deem just

and proper.

Dated: July 29, 2019
          New York, New York                         Respectfully submitted,

                                                     **WIGDOR LLP**

                                                     By: _____
                                                           Jeanne M. Christensen
                                                           Julia Elmaleh-Sachs

                                                     85 Fifth Avenue
                                                     New York, NY 10003
                                                     Telephone: (212) 257-6800
                                                     Facsimile: (212) 257-6845
                                                     jchristensen@wigdorlaw.com
                                                     jelmaleh-sachs@wigdorlaw.com

                                                     Asher Smith
                                                     PETA FOUNDATION
                                                     1536 16th Street, NW
                                                     Washington, DC 20036
                                                     Telephone: (202) 483-7382
                                                     Facsimile: (202) 540-2208
                                                     AsherS@petaf.org

                                                     *Counsel for Plaintiffs*